The PEOPLE of the State of
Colorado, Complainant,

v.

Joseph P. RADER, Attorney–
Respondent.

No. 91SA391.

Supreme Court of Colorado,
En Banc.

Jan. 13, 1992.

Linda Donnelly, Disciplinary Counsel, Jay P.K. Kenney, James C. Coyle, Asst. Disciplinary Counsel, Denver, for complainant.

Haddon, Morgan & Foreman, P.C., Bryan Morgan, Denver, for atty. respondent.

PER CURIAM.

In this attorney discipline proceeding, a hearing panel of the Supreme Court Grievance Committee recommended that the respondent be suspended from the practice of law for three months for conduct involving dishonesty, fraud, deceit, or misrepresentation. Neither the assistant disciplinary counsel nor the respondent has excepted to this recommendation. We accept the recommendation, and order that the respondent be suspended for three months and be assessed the costs of the proceeding.

I

The respondent was admitted to the bar of this court on May 17, 1977, is registered as an attorney upon this court's official records, and is subject to the disciplinary jurisdiction of this court and its grievance committee. C.R.C.P. 241.1(b). A hearing board of the grievance committee heard testimony from witnesses presented by both sides, and the respondent himself testified. After considering the testimony and exhibits, which included partial stipulations of fact, the board determined that the following facts were established by clear and convincing evidence.

The respondent was hired in November 1986 by Robert Friend to represent Friend's sister in a "bad check" case. In December 1986, the respondent and Friend discussed opening a new telemarketing business. The business involved contacting credit card holders by telephone and, for a charge which was originally $37.50 but quickly increased to $137.50, informing the card holders of lending institutions that provided low credit card interest rates. Friend asked the respondent to prepare the legal documents to incorporate the new corporation, The Corum Group, which would provide the telemarketing services. The respondent and Friend agreed that the respondent would participate personally in the new business.

The respondent prepared the documents necessary to incorporate Corum. Friend was designated as Corum's president, the respondent was the vice-president and secretary, and the respondent's wife was chairman of the board of directors. The respondent loaned the corporation funds. His duties involved researching the current charge card credit rates throughout the country and monitoring credit industry periodicals. Friend actually ran the telemarketing activities, and Friend and the respondent agreed to split the net profits of the corporation equally.

The respondent has admitted that, from the outset, Corum "was little more than a shell and was effectively the alter ego of both Friend and himself." [1] No corporate formalities were observed and the only asset of the corporation was a bank account that the respondent opened on behalf of Corum at the United Bank of Boulder to receive the telephonic charges to be levied against the credit cards of Corum's customers. When the respondent applied to open the account in December 1986, he assured officials of the bank that Friend was a reputable business man. Although the bank expressed concern regarding the nature of the new business, the bank approved the application for the account based upon the respondent's status as a valued customer of the bank, and as a local attorney. The account was established on January 13, 1987.

Friend and the telemarketing office manager instructed the twenty or so telemarketers to obtain the credit card holders' credit card numbers at all costs. The telemarketers were not to disclose, or were to deceptively disclose, Corum's charges for its service to its customers. [2] The respondent testified that he was initially unaware of these deceptive practices and did not suspect that Corum's telemarketing practices were improper until March 1987. The hearing board found that the telemarketers had been instructed by Friend to remove all

signs of complaints or questionable activity and to follow the original script for telephone solicitations to the letter when the respondent made one of his infrequent visits to Corum's offices.

In early February 1987, an official of the bank notified the respondent that she had received notice that some of the credit card charges were being disputed by holders of the cards and that she was concerned that the funds in the account were being withdrawn as quickly as they were deposited from the charge slips. Moreover, in late January 1987, the Boulder District Attorney's office, Consumer Affairs Division, began receiving consumer complaints involving Corum's business practices. In late February, the district attorney's consumer affairs division notified Corum of the complaints, and on March 3, 1987, the respondent advised the division that he was investigating the complaints and was trying to call back to confirm all sales.

In late February or early March 1987, Corum received three letters from the Iowa Attorney General's office enclosing consumer complaints which alleged that Corum was engaging in deceptive business practices. The respondent telephoned the Iowa Attorney General's office on March 3, 1987, and identified himself as the attorney for Corum. He was informed that the attorney general's office had been receiving four to six complaints daily about Corum since the end of January. The respondent objected to a refund of the charges because the customer had received a service.

In March 1987, United Bank informed the respondent that the Corum account would be closed. Friend established a new merchant account at a bank in Golden. Before the Boulder account was actually closed, and on a day when the respondent was out of town, Corum employees withdrew approximately $65,000 from the account at Friend's request. When the respondent returned the next day, and after receiving $19,000 from this "mass check

1. This admission is contained in the parties' Amended Joint Pretrial Disclosure Certificate filed with the grievance committee. It is not specifically included in the board's findings.

2. The facts set forth in the preceding two sentences are taken from the parties' Amended Joint Pretrial Disclosure Certificate and are not included in the board's findings.

cashing," he apologized to a United Bank official for the manner in which the funds had been withdrawn. He represented, however, that Friend had only been concerned that the bank would reassert a hold on the account because the bank feared that there would be insufficient funds in the account to cover future charge backs to the account.

In April 1987, the respondent received 210 pages of consumer complaints from the Boulder District Attorney's office and forty-seven written complaints from the Iowa Attorney General's office, all relating to Corum's business practices. The respondent was advised by the Secret Service on April 15, 1987, that it was investigating Corum. After meeting with the Secret Service, the respondent for the first time asked Friend to shut the business down. The respondent agreed to Friend's request that Friend be given until the end of April to close the business. Between April 23 and April 29, 1987, the respondent and his wife and Friend vacationed together in Hawaii.

When the respondent returned from Hawaii at the end of April, he found that additional charge backs had been received by United Bank, that the merchant account in Golden had been closed, and that there was a "shoe box" full of new sales slips from sales completed while Friend and he had been away. Friend told the respondent that a new bank account should be opened in order to process the new charges, and on May 6, 1987, the respondent flew to Delaware to open the new account. When he returned on May 8, the respondent discovered the doors to Corum's office were locked and the office had been cleaned out. Friend had disappeared with the remaining sales slips. At this point, the respondent contacted the district attorney in Boulder and offered to cooperate.

Of the $460,715 generated by the telemarketing business, charge backs totalling $335,826 were received and paid by the bank. Approximately $125,000 from Corum's receipts was paid directly to the respondent by virtue of the profit splitting agreement between the respondent and

Friend. United Bank sued the respondent for the full amount of the bank's losses. Following a jury verdict against the respondent in the amount of $322,000, the respondent paid the bank $40,000 to settle the case.

## II

The hearing board concluded that while it had not been established that the respondent "made any representation or material omission with knowledge of its falsity or with intent to deceive," it had been proven by clear and convincing evidence that the respondent "made representations by word or action with reckless ignorance of the truth or falsity of such representations." The representations that were made by the respondent with a reckless disregard for the true state of affairs included the following:

1. When he initially attempted to open the account at the United Bank of Boulder, the respondent told bank officials that Friend was a reputable business man.

2. The respondent's actions in establishing the Boulder account and signing the application as vice-president represented to the bank, at least by implication, that he would be an active participant, and that he would be responsible in assuring that the bank's stated concerns regarding the telemarketing business venture would be addressed.

3. Despite continuing and mounting concerns expressed by bank officials and various consumer fraud investigators, the respondent persisted in his assurances that everything was being taken care of, and that Corum was not engaging in deceptive trade practices. The respondent made these representations even though he did not participate in the day-to-day telemarketing activities and lacked control over those activities.

4. Even though he had actual knowledge of the extent of consumer complaints and knew that the Boulder account was significantly in arrears, the respondent travelled to Delaware in May 1987 and

opened up a new bank account for Corum in that state.

The hearing board concluded that the respondent's conduct violated DR 1–102(A)(4), which provides that a lawyer shall not "[e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation." The respondent contended before the board and the panel that a violation of DR 1–102(A)(4) requires that the attorney have actual knowledge of the facts giving rise to the dishonesty, fraud, deceit or misrepresentation, and that his conduct was at most negligent. The assistant disciplinary counsel argued that because DR 1–102(A)(4) is silent as to the appropriate mental state, no minimum mental state need be shown in establishing a violation of the rule, and the culpable mental state of the lawyer is relevant only insofar as it is a factor in assessing the appropriate sanction.

■ We agree with the hearing board that before a violation of DR 1–102(A)(4) can occur, and a lawyer may be found to have engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation, it must be shown that the lawyer possessed a culpable mental state greater than simple negligence. *See The Florida Bar v. Burke*, 578 So.2d 1099, 1102 (Fla.1991) (attorney's negligent handling of client funds did not support a finding that the attorney violated DR 1–102(A)(4); intent is a major and necessary element in a finding of dishonesty, fraud, deceit, or misrepresentation). In order to establish a violation of DR 1–102(A)(4), we conclude that the element of scienter must be shown.

We disagree, however, with the respondent's contention that actual knowledge or intent to deceive must be shown. Under certain circumstances, an attorney's conduct can be so careless or reckless that it must be deemed to be knowing and will constitute a violation of a specific disciplinary rule. *State ex rel. Nebraska State Bar Ass'n v. Holscher*, 193 Neb. 729, 230 N.W.2d 75, 79 (1975). We believe that the element of scienter is shown with respect to a violation of DR 1–102(A)(4) when it is established that the attorney "deliberately closed his eyes to facts he had a duty to see ... or recklessly stated as facts things of which he was ignorant." *United States v. Benjamin*, 328 F.2d 854, 862 (2d Cir.) (holding that government could meet its burden of proving willfulness in a prosecution for conspiracy to defraud in sale of unregistered securities by showing that defendant auditor had deliberately closed his eyes to facts that were plainly to be seen or recklessly stated as facts things of which he was ignorant), *cert. denied*, 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed.2d 497 (1964). *See also Ebrahimi v. E.F. Hutton & Co.*, 794 P.2d 1015, 1017 (Colo.App.1989) (scienter element in civil fraud case is satisfied by either conscious knowledge of the falsity of the representation or such recklessness as amounts to conscious indifference to the truth); *Ackerman v. Schwartz*, 733 F.Supp. 1231, 1247 (N.D.Ind.1989) (the element of scienter in a federal civil action involving violation of Section 10(b) of the Securities Exchange Act of 1934 may be satisfied by a showing of reckless conduct), *appeal dism'd*, 922 F.2d 843 (7th Cir.1991); *B & B Asphalt Co. v. T.S. McShane Co.*, 242 N.W.2d 279, 284 (Iowa 1976) (the element of scienter requires a showing that the alleged false representations were made with knowledge that they were false and this requirement is met when the evidence shows that the representations were made in reckless disregard of their truth or falsity).

■ We conclude that the hearing board properly found that the respondent made a number of representations with at least a reckless disregard for their truth or falsity and that such conduct violated DR 1–102(A)(4). The board also determined that the respondent violated DR 1–102(A)(6) (a lawyer shall not engage in conduct that adversely reflects on the lawyer's fitness to practice law), C.R.C.P. 241.6(1) (any act or omission violating the provisions of the Code of Professional Responsibility is grounds for attorney discipline), and C.R.C.P. 241.6(3) (misconduct involving any act or omission violating the highest standards of honesty, justice or morality is grounds for discipline).

## III

The hearing panel approved the hearing board's recommendation that the respondent be suspended for three months. Neither the assistant disciplinary counsel nor the respondent has excepted to the recommendation. When it analyzed the respondent's misconduct under the aggravating and mitigating factors contained in the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1986) (*ABA Standards*), the board found in aggravation that the respondent had benefitted financially from his dealings with Corum in an amount exceeding his settlement with United Bank, and that the respondent's settlement did not cover the bank's actual losses. *See ABA Standards* 9.22(b) (dishonest or selfish motive); 9.22(j) (indifference to making restitution). In mitigation, the respondent has no prior history of discipline, *id.* at 9.32(a); he made full and free disclosure to the grievance committee and exhibited a cooperative attitude toward the proceedings, *id.* at 9.32(e); the respondent has a good character or reputation, *id.* at 9.32(g); and the respondent displayed remorse for his misconduct, *id.* at 9.32(*l*).

Weighing the seriousness of the respondent's misconduct against the aggravating and mitigating factors, and taking into account the board's finding that the respondent lacked actual knowledge of Corum's deceptive business practices, *id.* at 3.0(b), we conclude that a three-month suspension is an appropriate sanction. Accordingly, we accept the recommendation of the hearing panel.

## IV

It is hereby ordered that Joseph P. Rader be suspended from the practice of law for three months, effective thirty days after the issuance of this opinion. C.R.C.P. 241.-21(a). It is further ordered that Rader pay the costs of this proceeding in the amount of $2,958.70 within sixty days after the announcement of this opinion to the Supreme Court Grievance Committee, 600 Seventeenth Street, Suite 500–S, Dominion Plaza, Denver, Colorado 80203.