154 P.3d 419 (2006)
The PEOPLE of the State of Colorado, Complainant,
v.
Carol A. CHAMBERS, Respondent.
No. 06PDJ036.
Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.
December 26, 2006.

OPINION AND ORDER IMPOSING SANCTIONS

I. SUMMARY

The Hearing Board concludes that the following counts have not been established by *421 clear and convincing evidence: Count I, violation of Colo. RPC 4.1(a) (in the course of representing a client, a lawyer shall not knowingly make a false or misleading statement); Count II, Colo. RPC 4.5(a) (a lawyer shall not threaten to present a criminal charge to gain an advantage in a civil case); and Count III, Colo. RPC 8.4(c) (a lawyer shall not engage in conduct involving dishonest, fraud, deceit, or misrepresentation). The Hearing Board concludes that clear and convincing evidence has been established that Respondent violated Count IV, Colo. RPC 8.4(d) (a lawyer shall not engage in conduct that is prejudicial to the administration of justice).

SANCTION IMPOSED: PUBLIC CENSURE

II. PROCEDURAL HISTORY AND BACKGROUND

On June 5, 2006, the People filed their complaint in this matter and Respondent filed her answer on June 28, 2006. The complaint contained four counts as enumerated in the summary above.[1]
The People presented four witnesses at the hearing: Jonathan Steiner, Esq., Gwen Kikendahl, Respondent, and Michael Knight, Chief Investigator in Respondent's office. Respondent presented four witnesses: Laurett Barrentine, Nathan Chambers, Esq., Mason Finks, and former Justice of the Colorado Supreme Court, Jean Dubofsky. The parties stipulated to the admission of Exhibits E, G, and Q. The People offered and the PDJ admitted Exhibits 1-5, and 7 during the hearing. Respondent offered and the PDJ admitted Exhibits A-C, K, M, and P during the hearing.
At the conclusion of the evidence, the People argued that Respondent's conduct, at a minimum, warrants public censure. Respondent argued that the People failed to establish clear and convincing evidence on any of the counts set forth in the complaint.

III. FINDINGS OF MATERIAL FACT

The Hearing Board considered the testimony of each witness and each exhibit admitted into evidence, and finds the following material facts established by clear and convincing evidence.
Background
Respondent has taken and subscribed the Oath of Admission, was admitted to the Bar of the State of Colorado on November 1, 1985, and is registered as an attorney upon the official records of the Colorado Supreme Court, Attorney Registration No. 14948. She is therefore subject to the jurisdiction of the Colorado Supreme Court and the Office of the Presiding Disciplinary Judge in these proceedings.
Respondent began her legal career as a clerk for a Colorado Court of Appeals judge and later practiced as an associate in a private law firm. In 1990, Respondent joined the District Attorney's office for the Eighteenth Judicial District as a deputy district attorney. She became a chief deputy district attorney in 1998. In November 2004, Respondent was elected as the District Attorney for the Eighteenth Judicial District and she serves in that capacity to date.
At all relevant times in this case, Respondent served as the elected District Attorney for the Eighteenth Judicial District. Laurett Barrentine was and is an Englewood City Councilperson with whom Respondent was acquainted from various political functions. In November 2005, Ms. Barrentine informed Respondent about a collection lawsuit Central Credit Corporation ("CCC") filed against her in Arapahoe County Court for allegedly writing two bad checks to Wal-Mart stores. Jonathan Steiner represented CCC in the collection lawsuit. Ms. Barrentine told Respondent that she had been a victim of identity theft in 1999 and that she had not written the checks in question. Ms. Barrentine also told Respondent that CCC and Mr. Steiner both knew that she had not written the checks and that Mr. Steiner and CCC were using the court system in a way designed *422 to "get people to pay on checks that they did not owe."
The Collection Lawsuit  CCC v. Barrentine
By the time Ms. Barrentine spoke to Respondent in early November 2005, she had already spoken on the phone numerous times to "collectors" from CCC. Ms. Barrentine repeatedly told the collectors that she had not written the checks in question and at the same time demanded copies of them. CCC never sent her the checks. Ms. Barrentine ultimately demanded that the CCC collectors stop calling and instead sue her if they thought she owed them money. Two weeks later she was served with a complaint.
On July 28, 2005, Mr. Steiner filed a complaint against Ms. Barrentine on behalf of CCC in Arapahoe County Court.[2] The parties appeared at a court-ordered return date on August 24, 2005. On that date, Ms. Barrentine filed an answer and counterclaim for $5,000 and also requested a jury trial. The magistrate scheduled the case for a jury trial and ordered mandatory mediation. Each party paid a mediation fee of $110.00.
The parties attended the mandatory mediation on October 26, 2005. Mr. Steiner offered to dismiss the case, however, Ms. Barrentine refused to accept a dismissal unless CCC paid her costs, as authorized for the prevailing party by C.R.S. § 13-21-109(6).[3] At that point, Mr. Steiner refused to pay her costs.
Mr. Steiner has been licensed to practice law for 15 years and has filed approximately 100 bad check cases a month over the past five years as a collections lawyer. When Mr. Steiner filed this case on behalf of CCC against Ms. Barrentine, he did so without determining whether the account on which the checks in question belonged to Ms. Barrentine. Instead, Mr. Steiner and CCC relied solely upon the name and signature on the checks: Laurett Barrentine. Mr. Steiner and CCC expected Ms. Barrentine to provide evidence that she did not author the checks in question
Respondent's Knowledge of Complaints Against Collection Agencies as of January 23, 2006
In addition to Ms. Barrentine's specific complaint about CCC and Mr. Steiner, Respondent also possessed a general knowledge of other citizen complaints reported to her office concerning abusive collection agency practices and the exponential growth of identity theft in Colorado. The uncontested evidence is that Colorado ranked fifth in the nation in reported identity theft at the time Respondent called Mr. Steiner.
Before she spoke to Mr. Steiner, Respondent had frequently conducted public forums with constituents and had discussed developing consumer fraud issues with Mason Finks, the Director of Fraud Prevention in her office. She also read the "fraud alerts" issued by Mr. Finks and other fraud prevention coordinators concerning these developments in the Denver Metro area.[4]
In a discussion with Respondent in early January 2006, Mr. Finks specifically told Respondent that he had recently received a number of complaints from citizens who claimed that they were victims of identity theft and that collection agencies were harassing them to pay debts they did not owe.
As a result of these complaints and notices, Respondent testified that she was concerned about both Mr. Steiner's collection lawsuit against Ms. Barrentine and the possibility that collection agencies might be engaging in a pattern of using the court system to criminally extort money from identity theft victims by forcing them to pay debts they did not owe. However, Respondent also testified that as of January 23, 2006, the only complaint against Mr. Steiner she knew about was the one made by Ms. Barrentine.
*423 Voicemail of January 23, 2006
On January 23, 2006, after business hours, Respondent telephoned Mr. Steiner from her home and left him the following voicemail at his law office:[5]
Mr. Steiner, this is Carol Chambers, the District Attorney for Arapahoe Douglas Elbert and Lincoln counties, and I am calling you because we are getting a lot of complaints from victims of identity theft that you are pressuring them shall I say, to pay on checks that they did not write, that their bank knew that they did not write, that should be obvious to you that they did not write. And I am looking at investigating this with the grand jury, and I would like to hear your input first, if you would like to make it. But this appears to be what is very concerning and certainly when a check is marked clearly "account closed," it does not come under the purview of XX-XX-XXX. So, I'd be happy to have you come in and talk to me about this but it is problematic and needs to be resolved. My number XXX-XXX-XXXX. Thank you.[6]
Reaction of Mr. Steiner and CCC to the Voicemail of January 23, 2006
Mr. Steiner interpreted the message left by Respondent to mean that she had numerous citizen complaints about him. These allegations concerned him. Mr. Steiner thereafter contacted Gwen Kikendahl, Vice President of Operations for CCC, who was also concerned about the voicemail. They decided that the best course of action would be to resolve the case against Ms. Barrentine. Ms. Kikendahl later checked with the Colorado Attorney General's Collections Board, the entity that regulates collection agencies in Colorado, and discovered no reported complaints against Mr. Steiner or CCC. Mr. Steiner also checked with the Colorado Supreme Court and found no complaints against him individually.
Action Taken by Respondent on January 24, 2006
On January 24, 2006, the day after she left the voicemail for Mr. Steiner and before he returned her call, Respondent directed her chief investigator, Michael Knight, to investigate whether Mr. Steiner had been coercing Ms. Barrentine into paying a debt she did not owe. Respondent also asked Mr. Knight to complete a handwriting analysis on Ms. Barrentine to confirm that she did not author the checks Mr. Steiner had been attempting to collect.[7] Although she ordered it, Respondent told Mr. Knight not to complete the handwriting analysis until Ms. Barrentine's civil case had been resolved. Respondent testified that she did not want the analysis completed "for the purpose of her [Ms. Barrentine's] civil case" and that Ms. Barrentine "should be clear on that."[8]
At Respondent's direction, Mr. Knight initiated the investigation by completing a standard investigation request form in which he wrote "investigate complaint that attorney John [sic] Steiner was attempting to coerce Laurett Barrentine into paying for a bad check that she did not write because she was a victim of ID theft."[9] Respondent wanted to keep her work on the criminal investigation of Mr. Steiner separate from the collection lawsuit and advised Mr. Knight that her husband, Nathan Chambers, a private attorney, would provide pro bono counsel services to Ms. Barrentine on the civil matter.[10] As of January 24, 2006, Respondent described the *424 scope of her investigation as "potentially investigating the practices of Walmart [sic] and this attorney [Mr. Steiner] as I think he is being coercive."[11]
In addition to directing Mr. Knight to open an investigation of Mr. Steiner, Respondent ordered a transcript of the civil proceedings before the county court magistrate judge in July 2005. Based on Ms. Barrentine's report to her, Respondent was concerned that both the magistrate and the mediator tried to pressure Ms. Barrentine to pay the checks and not go to trial.[12] Before leaving the voicemail for Mr. Steiner, Respondent ordered and read the file, which at the time contained only the complaint and the answer Ms. Barrentine filed in August 2005.
Efforts of Nathan Chambers in the Collection Lawsuit
Ms. Barrentine's collection lawsuit was scheduled for a jury trial on February 1, 2006. On January 30, 2006, Nathan Chambers called Mr. Steiner and questioned the legal authority for certain jury instructions Mr. Steiner had submitted in the collection lawsuit.[13] Nathan Chambers also suggested that Mr. Steiner lacked proof that Ms. Barrentine wrote the checks in question. Mr. Steiner had endorsed one employee from CCC to testify that the company had complied with the Colorado Fair Debt Collection Act by sending out 15-day and 30-day letters demanding payment. However, Mr. Steiner's disclosures did not suggest that CCC's witness could testify as to who presented or authored the checks in question.
Mr. Steiner told Nathan Chambers, as he earlier told Ms. Barrentine at the mediation conference, that CCC was willing to dismiss the collection lawsuit. However, CCC would not pay Ms. Barrentine's costs as part of the settlement. During this exchange, Mr. Steiner inquired and Nathan Chambers acknowledged that he was Respondent's husband. Mr. Steiner then expressed his concern about Respondent's voicemail and the fact that Respondent had not returned his calls. Nathan Chambers told Mr. Steiner that he knew nothing about the matter and directed him to call Respondent.
After speaking to Mr. Steiner, Nathan Chambers spoke to Ms. Barrentine by telephone. Ms. Barrentine expressed concern that she might have to pay attorney fees even if she won the case; this is what Mr. Steiner had advised her. Nathan Chambers told Ms. Barrentine that he thought she would win the case but that "anything was possible" and she might have to pay assessed attorney's fees, even if she won.
Following her discussion with Nathan Chambers, Ms. Barrentine decided she would represent herself if the case went to trial because Nathan Chambers did not share her "passion" for the case.
Respondent's Telephone Call to Mr. Steiner on January 30, 2006
On January 30, 2006, shortly after Nathan Chambers informed Respondent that he had spoken to Ms. Barrentine and Mr. Steiner, Respondent called Mr. Steiner. This time, she called from her office and also asked Mr. Knight to witness the conversation. Mr. Steiner immediately asked if Respondent indeed had "numerous complaints" from citizens about him. Respondent told Mr. Steiner that she did not mean leave him with the impression that she had "numerous complaints" against him. Instead, she claimed that her earlier voicemail referred to numerous complaints against collection agencies in general.
Since Respondent did not have numerous complaints against him, Mr. Steiner asked Respondent to provide him with a letter confirming that he was not a target of a grand jury investigation. She declined to write such a letter. Respondent instead informed Mr. Steiner that she was conducting an investigation of collection agency abuses and *425 that she could not exclude him from such an investigation, although Mr. Steiner was not a target at the time.[14]
During the January 30, 2006 telephone conversation, Mr. Steiner also asked Respondent if her voicemail of January 23, 2006 concerned the Barrentine case, as he had earlier surmised. Respondent acknowledged it did. Mr. Knight testified that this conversation "centered" on Ms. Barrentine's case. Furthermore, it did not appear to Mr. Knight that Respondent questioned Mr. Steiner as a representative of collection agencies. Respondent specifically asked Mr. Steiner how he could proceed against Ms. Barrentine when he had no proof that Ms. Barrentine presented or wrote the checks in question. When Mr. Steiner pointed out that he based his complaint on C.R.S. § 13-21-109,[15] Respondent challenged whether he could prove such a claim. Although Respondent agreed with Mr. Steiner that she was wrong (C.R.S. § 13-21-109 applied to "no account" checks), Respondent still challenged Mr. Steiner for attempting to collect a debt from a victim of identity theft. Respondent then questioned the jury instructions Mr. Steiner prepared and challenged his right to collect attorney fees, if he lost the case.[16] Mr. Steiner left this encounter believing that Respondent might indeed investigate him for filing a case against Ms. Barrentine.[17]
Dismissal of the Collection LawsuitCCC v. Barrentine
Ms. Barrentine called Mr. Steiner shortly after he concluded his conversation with Respondent. Mr. Steiner told Ms. Barrentine that he could not speak to her if Nathan Chambers represented her. Ms. Barrentine assured Mr. Steiner that Nathan Chambers did not represent her so they proceeded to discuss the collection lawsuit scheduled for jury trial in two days. Again, Mr. Steiner offered to dismiss the case but CCC would not pay Ms. Barrentine's costs. Ms. Barrentine persisted in her demand that CCC pay her costs and informed Mr. Steiner that she was prepared to go to trial pro se if CCC did not pay her costs. She then hung up.
Within an hour, Mr. Steiner called Ms. Barrentine back and agreed to dismiss the case and pay her costs. The parties then signed a mutual release after Nathan Chambers reviewed it. Mr. Steiner testified that he did not dismiss the case based upon Respondent's voicemail of January 23, 2006. However, he ultimately decided that it would not be prudent to take the case to trial, especially if Ms. Barrentine actually had some proof that she did not write the checks.

IV. CONCLUSIONS OF LAWSUBSTANTIVE ALLEGATIONS

Count I
Colo. RPC 4.1 provides that in the course of representing a client, a lawyer shall not knowingly make a false or misleading statement of fact to a third person. The People argued that Respondent made a false or misleading statement in her January 23, 2006 voicemail to Mr. Steiner; that is, Respondent was aware at the time she made the statement that she had only one complaint against Mr. Steiner but nevertheless *426 knowingly and falsely stated that she had numerous complaints against him.[18]
While it is understandable that Mr. Steiner would interpret Respondent's voicemail as a statement directed at him, and not collection agencies in general, the Hearing Board must examine this statement from Respondent's perspective and determine whether she knew that her statement was false or misleading at the time she made it.[19]
With the knowledge of collection agencies Respondent had, and further knowledge that complaints had been made regarding companies or individuals unspecified to her, Respondent may have been using the term "numerous complaints" about "you" in a collective sense, rather than individually, when she left the voicemail message on January 23. Taking into account that reasonable possibility, along with her clarification in her call to Mr. Steiner on January 30, the Hearing Board cannot find evidence that Respondent's voicemail was knowingly false or misleading.
Count II
Colo. RPC 4.5(a) states that a lawyer shall not threaten to present criminal charges to obtain an advantage in a civil matter.
Respondent notified Mr. Steiner that she was "looking at investigating this with the grand jury." Respondent did not say that she would present criminal charges against Mr. Steiner. Prosecutors often advise subjects of grand jury investigations that they might become targets of a grand jury investigation. Indeed, subjects of such investigations may be better served if the prosecutor is honest and forthright about her intention to investigate and the possibility that an inquiry might lead to further evidence and the possibility of a future indictment. Thus, the Hearing Board finds that Respondent's statement that she was "looking into investigating" numerous citizen complaints about Mr. Steiner or the collection industry, without more, falls short of clear and convincing evidence of a threat to present criminal charges against Mr. Steiner.
Count III
Colo. RPC 8.4(c) states that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. The People's complaint states, "[a]gain the statement contained in the January 23, 2006 voicemail that respondent had received a lot of complaints against Mr. Steiner, or anyone else, is false." As stated above, Respondent's statement might have been poorly articulated, extemporaneous and made in haste, but falls short of clear and convincing evidence of an intent to deceive.
Count IV
The Hearing Board finds clear and convincing evidence that Respondent violated Colo. RPC 8.4(d) by engaging in conduct that is prejudicial to the administration of justice.[20]
The district attorney is not an ordinary litigant; she represents the People of the State of Colorado.[21] In representing citizens, the prosecutor is vested with broad discretionary authority to investigate and *427 charge criminal conduct.[22] Nevertheless, prosecutors, like all other lawyers, must act within the bounds of professional ethics.
"Since the prosecutor bears a large share of the responsibility for determining which cases are taken into the courts, the character, quality, and efficiency of the whole system is shaped in great measure by the manner in which the prosecutor exercises his or her broad discretionary powers." ABA Standards for Prosecution and Defense, Commentary to Standard 3-1.2 (1993). The "responsibility to enforce the laws in [her] judicial district grants [her] no license to ignore those laws or the Code of Professional Responsibility." In re Pautler, 47 P.3d 1175, 1180 (2002) citing People v. Reichman, 819 P.2d 1035 (Colo.1991).
Furthermore, in exercising public authority on behalf of its citizens, it is well settled that the prosecutor is a "minister of justice," not a private advocate who represents individual interests. Of all the lawyers in our system of justice, none other than the prosecutor practices in a "quasi-judicial" capacity. See ABA Standards for Prosecution and Defense, Commentary to Standard 3-1.2 (1993).
While Respondent was not counsel for Ms. Barrentine in the civil matter, she nevertheless, directed questions to Mr. Steiner directly implicating the pending civil suit against Ms. Barrentine. Respondent admittedly recognized the need to keep the civil matter involving Ms. Barrentine and her criminal investigation separate. She specifically requested Mr. Knight, her chief investigator, to hold off the handwriting analysis of the checks in question until the conclusion of the civil case. In addition, she asked her husband to counsel Ms. Barrentine on the civil matter so that she could investigate "generally" whether Mr. Steiner or others in the collection industry had committed crimes against citizens who were victims of identity theft.
In spite of her initial effort to keep Ms. Barrentine's civil matter separate from her proposed criminal investigation, the Hearing Board concludes that Respondent left a voicemail for Mr. Steiner on January 23, 2006 with dual motives: first, to assist Ms. Barrentine in the collection lawsuit and second to begin a potential criminal investigation of collection agencies and their lawyers. However, by January 30, 2006, Respondent's principal motive in addressing Mr. Steiner was to assist Ms. Barrentine
Nevertheless, Respondent argues that she could not have engaged in conduct prejudicial to the administration of justice by inquiring into Mr. Steiner's conduct. As the elected District Attorney in the Eighteenth Judicial District, Respondent believes she was elected to be an "activist" on behalf of constituents and victims of crime. She argues that her actions served, rather than hindered the effective administration of justice because a frivolous case was ultimately dismissed.
Respondent was neither a party nor a counsel to a party in the Barrentine litigation; had she applied the same level of discretion and patience in contacting Mr. Steiner as she showed in deferring the handwriting analysis, the impropriety in interfering with civil litigation would have been avoided. The Hearing Board finds that when Respondent intervened in Ms. Barrentine's civil case, she effectively placed her finger on the scales of justice on behalf of one party to a civil case. " [A]cting to advance the cause of a civil litigant while serving as the duly-elected county prosecutor [is] prejudicial to the administration of justice, in violation of . . . Professional Conduct Rule 8.4(d). In the Matter of Robert T. Miller, 677 N.E.2d 505, 508 (Ind.1997).[23]
Respondent's testimony that she specifically considered the potential for violating Colo. RPC 4.5 before she left a voicemail for Mr. Steiner, demonstrates her appreciation of the ethical principles implicated in contacting *428 him on the heals of Ms. Barrentine's complaint. Nevertheless, Respondent subsequently failed to elect the safest method of and timing for dealing with a criminal investigation that was admittedly preliminary and not well defined. Thus, Respondent acted precipitously and negligently in determining whether it was proper to confront Mr. Steiner in the manner she did. This supports a finding of negligent, rather than intentional or knowing wrongdoing. Moreover, the Hearing Board has concluded that her conduct did not violate Colo. RPC 4.5, but rather Colo. RPC 8.4(d), conduct prejudicial to the administration of justice.
Even though Respondent's conduct falls short of making false or misleading statements, threats to present criminal charges, or dishonesty, Respondent's conduct through her words and actions prejudiced the administration of justice; prosecutors should not use their broad discretion and authority to prosecute crime to advance the cause of a private litigant. Using the "respect and status" of the district attorney's office to influence a civil matter is prejudicial to the administration of justice. See Gallagher v. Hertz, 198 Colo. 522, 608 P.2d 335, 337 (1979). And while Respondent was earnestly attempting to assist a constituent and pro se civil litigant she believed to be the victim of identity theft, her motives may mitigate but do not excuse her conduct. In re: Pautler, 47 P.3d 1175, 1179 (Colo.2002).

V. SANCTIONS

The American Bar Association Standards for Imposing Lawyer Sanctions (1991 & Supp.1992) ("ABA Standards") and Colorado Supreme Court case law are the guiding authorities for selecting and imposing sanctions for lawyer misconduct. The appropriate sanction depends upon the facts and circumstances of each case.

Analysis Under the ABA Standards
ABA Standards 6.3 concerns Improper Communications with Individuals in the Legal System. Section 6.33 provides:
Reprimand is generally appropriate when a lawyer is negligent in determining whether it is proper to engage in communication with an individual in the legal system, and causes injury or potential injury to a party or interference or potential interference with the outcome of the legal proceeding.
Reprimand is therefore the presumptive sanction for Respondent's misconduct in Count IV. However, before imposing a sanction after a finding of lawyer misconduct, ABA Standard 3.0 directs the Hearing Board to first consider the following factors to determine whether the presumed sanction is appropriate:
(1) the duty violated;
(2) the lawyer's mental state;
(3) the actual or potential injury caused by the misconduct; and
(4) the existence of aggravating or mitigating factors.
A. THE DUTY VIOLATED
Respondent violated her duty as an attorney to the justice system. Respondent did not act exclusively as a minister of justice; instead she acted with dual motives on behalf of the criminal justice system and on behalf of Ms. Barrentine. The public trust in our judicial system, both civil and criminal, depends in great measure on prosecutors acting in accordance with accepted procedures as well as ethical rules. By using the authority of her office and thereby tipping the scales of justice in favor of Ms. Barrentine, Respondent undermined the civil process, which has its own rules and procedures for dealing with private disputes.
Recognizing that a pro se litigant might not be treated fairly by a lawyer who files a civil law suit without fully investigating the merits of his case is a matter that should concern all lawyers. However, the manner in which Respondent addressed this issue violated her duty to the judicial process.
B. THE LAWYER'S MENTAL STATE
Respondent acted negligently. In her zealous effort to accomplish her dual objectives, she acted rashly without analyzing how to avoid using her public authority for a private matter.
*429 C. THE ACTUAL OR POTENTIAL INJURY
Respondent was willing to use the authority vested in her public office partially to prevent what she considered to be an injustice. Respondent testified that her actions were taken in part to protect an innocent victim but in doing so she prejudiced the administration of justice in the civil courts.
Respondent argues that her actions were in harmony with the administration of justice, because a frivolous lawsuit was appropriately dismissed. This argument of "the end justifies the means" does not answer the question of whether Respondent harmed the effective administration of justice by improperly using her public authority in a private matter, no matter what the ultimate outcome might have been. In addition, Respondent's actions potentially injured the integrity of the civil process and the criminal justice system.
D. AGGRAVATING AND MITIGATING FACTORS
1. MATTERS IN AGGRAVATION, ABA STANDARD 9.2
The Hearing Board considered evidence of the following aggravating circumstances in deciding the appropriate sanction to impose.
Substantial Experience in the Practice of Law9.22(i)
Respondent has practiced law for nearly twenty years, most of that time as a prosecutor.
2. MATTERS IN MITIGATION, ABA STANDARD 9.3
The Hearing Board considered evidence of the following mitigating circumstances in deciding the appropriate sanction to impose.
Absence of a Prior Disciplinary Record9.32(a)
Respondent practiced nearly 20 years without a prior disciplinary record.
Absence of a dishonest or selfish motive.9.32(b)
There was no evidence that Respondent acted with a dishonest or selfish motive.
Full disclose and a cooperative attitude toward the proceedings9.32(e)
The People concede this mitigating factor and the Hearing Board acknowledges that although she contested the conclusions of the People, Respondent cooperated in these proceedings.

Analysis Under Case Law and ABA Standards
Respondent correctly points out that only the prosecutor has authority to investigate and prosecute crimes. However, Respondent's conduct went beyond ferreting out crime on behalf of the People. Respondent acted, to assist Ms. Barrentine on the eve of the civil trial. By doing so, Respondent violated Colo. R.P.C. 8.4(d) and engaged in conduct that risked injury to and interference with the civil justice system as well.
The Hearing Board considered that Respondent believed that CCC and Mr. Steiner were indeed victimizing Ms. Barrentine. Respondent had evidence suggesting the desirability of looking further to see if there was any criminal wrongdoing not only from Ms. Barrentine but also from Mr. Fink, her consumer fraud coordinator and other sources. Nevertheless, Respondent acted without sufficient deliberation in confronting Mr. Steiner.

VI. CONCLUSION

Reprimand is generally appropriate when a lawyer negligently communicates with an individual in the legal system and thereby causes potential interference with the outcome of a legal proceeding. Respondent called the lawyer who brought a collection lawsuit against one of her constituents and without sufficient deliberation told him that she was looking at investigating him for engaging in coercive tactics in the suit. This was prejudicial to the administration of justice.
Although Respondent's actions warrant discipline, the Hearing Board cannot find her conduct to have been more than negligent. Finally, due to the public nature of this disciplinary proceeding and the media coverage it received, Respondent has been subjected to *430 extensive public exposure and scrutiny. We trust that the actions of the Hearing Board will both protect the public and educate attorneys, including Respondent, in the future.

VII. ORDER

The Hearing Board therefore ORDERS:
1. CAROL A CHAMBERS is hereby PUBLICLY CENSURED.
2. CAROL A. CHAMBERS SHALL pay the costs of these proceedings. The People shall submit a Statement of Costs within fifteen (15) days from the date of this Order. Respondent shall have ten (10) days thereafter to submit a response.
NOTES
[1] On October 5, 2006, the PDJ denied Respondent's First, Second, Third, and Fourth Motions for Summary Judgment as they related to Counts I, II, III, and IV of the People's Complaint.
[2] See Respondent's Exhibit E. The two checks totaled $320.32.
[3] Ms. Barrentine's costs of litigation at this point included an answer and counterclaim fee of $45.00, a jury fee of $75.00, and a mediation fee of $110.00 for a total of $220.00.
[4] See the People's Exhibit 19.
[5] Mr. Steiner's voicemail greeting identified him as the attorney for CCC and two other collection agencies.
[6] See the People's Exhibit 2.
[7] See Respondent's Exhibit K.
[8] See Respondent's Exhibit K.
[9] See the People's Exhibit 7. Mr. Knight testified that the investigation later expanded to include collection industry attempts to collect debt from citizens who were victims of identity fraud. This investigation was ongoing as of the date of this hearing. To date, however, Ms. Barrentine's is the only complaint from a citizen claiming to be the victim of an identity theft wherein personal information was used to write checks in the victim's name.
[10] Nathan Chambers testified that he was reticent to assist Ms. Barrentine in the collection lawsuit because of a possible "appearance of impropriety" as opposed to an actual conflict of interest.
[11] See Respondent's Exhibit K. On January 30, 2006, Respondent told Mr. Steiner that she was investigating collection agency abuses.
[12] See the People's Exhibit 5.
[13] The party requesting a jury trial in the county court normally prepares the jury instructions. However, Mr. Steiner prepared the jury instructions in this case because Ms. Barrentine appeared pro se.
[14] Respondent did in fact conduct an investigation after questioning Mr. Steiner. Her investigation was an effort to determine whether collection agencies were criminally extorting money from identity theft victims who were not responsible for the debt collection agencies demanded they pay. See C.R.S. § 18-3-207.
[15] "If notice of nonpayment on presentment of the check, draft or order has been given in accordance with the provisions of subsections (3) and (4) of this section and the total amount due as set forth in the notice has not been paid within fifteen days after such notice is given, instead of the amounts set forth in paragraph (a) or (b) of this section, the person shall be liable to the holder or any assignee for collection for three times the face amount of the check but not less than one hundred dollars." C.R.S. § 13-21-109(2)(a).
[16] See Exhibit E. Mr. Steiner drafted instructions, which, if given, could have directed the jury to award Mr. Steiner his attorney fees and costs. When the county court judge received these instructions, he rejected them and directed Mr. Steiner to submit stock instructions.
[17] Mr. Knight testified that the investigation of Mr. Steiner was still ongoing at the time of these proceedings.
[18] The People argued during the hearing that Respondent's statements during the voicemail message were at least reckless and that the Court could infer knowledge as found in People v. Rader, 822 P.2d 950, 952 (Colo.1992) (Court found that under certain circumstances, an attorney's conduct can be so careless or reckless as to be deemed knowing).
[19] See Colorado Rules of Professional Conduct, Terminology. "Knowingly" denotes actual knowledge of the fact in question. A person's knowledge may be inferred from circumstances.
[20] Respondent argued that this claim is vague, especially when considering the broad authority of the prosecutor to investigate crime. In a motion for summary judgment on this count, Respondent argued that the People must clearly show that the conduct is outside Respondent's discretionary authority. But see United States v. Colorado Supreme Court, 189 F.3d 1281, 1287 (10th Cir.1999) (where court pointed out that ethical standards can often be vague in nature, but given the traditions of the profession and lawyers special training, they are enforceable against attorneys).
[21] See C.R.S. § 20-1-102.
[22] "Prosecutorial discretion is a hallmark of our criminal justice system that flows from the doctrine of separation of powers. See People in Interest of J.A.L., 761 P.2d 1137 (Colo.1988). In order to preserve the required separation of powers, a prosecutor's charging decision may not be controlled or limited by judicial intervention." People v. Bostelman 141 P.3d 891, 897 (Colo.App. 2005) citing People v. Dist. Court, 632 P.2d 1022 (Colo.1981).
[23] In this matter, the Indiana Supreme Court reprimanded and admonished the prosecutor.