The PEOPLE of the State of Colorado, Complainant

v.

David J. GREENE, Respondent.

Nos. 10PDJ137, 11PDJ006.

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

Oct. 3, 2011.

On August 1 and 2, 2011, a Hearing Board composed of JOHN M. LEBSACK AND PAUL J. WILLUMSTAD, members of the bar, and WILLIAM R. LUCERO, the Presiding Disciplinary Judge ("the PDJ"), held a hearing pursuant to C.R.C.P. 251.18. Adam J. Espinosa appeared on behalf of the Office of Attorney Regulation Counsel ("the People"), and David J. Greene ("Respondent") appeared with counsel, Gary D. Fielder. The Hearing Board now issues the following "Opinion and Decision Imposing Sanctions Pursuant to C.R.C.P. 251.19(b)."

**OPINION AND DECISION IMPOSING SANCTIONS PURSUANT TO C.R.C.P. 251.19(b)**

### I. *SUMMARY*

The People allege Respondent breached numerous Rules of Professional Conduct in his representation of four clients. The PDJ determined earlier in this proceeding, on the People's motion for summary judgment, that Respondent violated Colo. RPC 1.3 by acting without the requisite diligence in one client matter, and he violated Colo. RPC 1.15(i)(3) by failing to safeguard client funds in another matter. We now conclude that, through the course of the four matters at issue, Respondent also violated Colo. RPC 1.1, 1.4(a)(3), 1.4(a)(4), and 1.16(d) by inadequately communicating with clients, failing to represent a client competently, and unreasonably delaying the return of a client's file after the representation ended. We do not, however, find clear and convincing evidence that Respondent contravened Colo. RPC 1.15(a), 8.1(a), or 8.4(c), as alleged by the People. In light of the nature of Respondent's misconduct, the ramifications of that misconduct, and the aggravating and mitigating factors here, we determine the appropriate sanction is suspension for nine months, with three months served and six months stayed pending the successful completion of a two-year probationary period with conditions.

### II. *PROCEDURAL HISTORY*

On December 21, 2010, the People filed a complaint in case number 10PDJ137, alleging Respondent violated Colo. RPC 1.3, 1.4(a)(3), 1.4(a)(4), 1.15(a), 1.15(i)(3), 1.16(d), and 8.4(c) with respect to two clients, Ky Nguyen ("Nguyen") and Gertrude Barnes ("Barnes"). Respondent filed an answer on February 7, 2011.

On February 1, 2011, the People filed a second complaint—this time under case number 11PDJ006—alleging Respondent violated Colo. RPC 1.1, 1.3, 1.4(a)(3), 1.4(a)(4), 8.1(a), and 8.4(c) in matters involving two additional clients, Dennis Justi ("Justi") and Anna Caraghar ("Caraghar"). Respondent answered the second complaint on February 23, 2011.

On April 29, 2011, the PDJ consolidated case number 11 PDJ006 into case number 10PDJ137.

The People filed a motion for summary judgment on June 2, 2011, to which Respondent responded on July 7, 2011. The People sought summary judgment as to all of the claims originally pled under case number 10PDJ137. Although Respondent admitted he violated Colo. RPC 1.15(i)(3) in the Barnes matter, he otherwise contested entry of summary judgment. The PDJ entered summary judgment on Claims I (Colo. RPC 1.3) and IX (Colo. RPC 1.15(i)(3)) of the complaint in case number 10PDJ137, but the PDJ denied summary judgment as to the remainder of the claims at issue.

During the hearing on August 1 and 2, 2011, the Hearing Board heard testimony and considered stipulated exhibits 1–19, Respondent's exhibits A–I, and the People's exhibits 20–36 and 38–40. At the conclusion of the hearing, the PDJ permitted Respondent to file a supplemental brief outlining Respondent's proposed course of action to ensure his future compliance with the Rules of Professional Conduct. The PDJ also allowed the People to file a responsive brief.

### III. *FINDINGS OF FACT AND RULE VIOLATIONS*

The Hearing Board finds the following facts and rule violations have been established by clear and convincing evidence.

#### Jurisdiction

Respondent took the oath of admission and was admitted to the bar of the Colorado Supreme Court on September 29, 1978. He is registered upon the official records under attorney registration number 08994 and is thus subject to the jurisdiction of the Colorado Supreme Court, the PDJ, and the Hearing Board in these disciplinary proceedings.[1] Respondent's address is 5775 Olde Wadsworth Boulevard, # R700, Arvada, Colorado 80002.

---

1. *See* C.R.C.P. 251.1(b).

## Representation of Nguyen

On October 30, 2005, Respondent filed a complaint in Adams County District Court on behalf of Nguyen, whose son was killed in a November 2003 car accident. In this lawsuit, Nguyen asserted wrongful death claims as father and executor of his son's estate against the E–470 Public Highway Authority ("E–470"), the Colorado Department of Transportation ("CDOT"), Ideal Fencing Corporation ("Ideal"), and American Civil Constructors, Inc. ("ACC"). The district court dismissed the claims against E–470 in pre-trial litigation.[2] On June 5, 2007, the court dismissed Nguyen's claims against CDOT on governmental immunity grounds and conditionally dismissed the claims against Ideal and ACC on the basis that those companies lacked responsibility for the highway guardrail at issue.[3] Although the court stayed the conditional dismissal for thirty days to permit Nguyen to request an opportunity to conduct additional discovery regarding Ideal and ACC, Respondent did not exercise that right; he testified at the disciplinary hearing that he had concluded CDOT was accountable for the guardrail, so he had no basis for contesting the dismissal of Ideal and ACC.

On December 18, 2007, the court reviewed the status of the Nguyen matter. In light of several pending motions for reconsideration, for attorney's fees, for amendment of the complaint, and for extensions of time, the court ordered Respondent to file a status report within fifteen days indicating which issues remained before the court and whether Nguyen intended to move forward with the case.[4] Although the order specifically noted that failure to file the requested status report would lead to an order dismissing the case in its entirety,[5] Respondent filed no status report with the court.[6]

A status conference was then set in Nguyen's matter for February 13, 2008.[7] Although Respondent concedes he was served with the notice of status conference, he did not see the notice and therefore failed to attend the conference. He attributes this error to the facts that he no longer employed a secretary and the notice arrived while he was busy caring for his children at Christmastime. At the status conference, the court determined Respondent had previously received appropriate notice that Nguyen's case would be dismissed if Respondent did not file the ordered status report.[8] The court entered a written order ruling that Respondent had not complied with its earlier directive and dismissing Nguyen's case without prejudice.[9]

As noted above, the PDJ granted summary judgment on the People's Colo. RPC 1.3 claim, determining as a matter of law that Respondent did not represent Nguyen with the requisite diligence and promptness.[10] Even though the evidence does not establish that Nguyen's case would have remained viable if Respondent had submitted the status report and attended the status conference, his failure to take those actions amounted to a violation of his duty to diligently represent his client.

Nguyen related at the disciplinary hearing that after the court dismissed his case, Respondent told him only that his case had been "denied" and that the judge did not "agree with the case." According to Nguyen, Respondent never mentioned that he had failed to comply with court orders and that his inaction precipitated the dismissal. Respondent, for his part, made varying and inconsistent assertions on this score: he testified on direct examination that he remembered telling Nguyen his failure to attend the status conference had led to the dismissal; he said on cross-examination that he did not

2. The available evidence does not clearly indicate the date of this dismissal.

3. Exs. A–B.

4. Ex. 2.

5. *Id.*

6. Ex. 4.

7. Ex. 3.

8. Ex. 4.

9. *Id.*

10. Order Re: Complainant's Mot. Summ. J.

remember exactly how he explained the dismissal to Nguyen; and he admits in his answer he did not tell Nguyen that his case was dismissed due to his failure to appear for the status conference.[11] Respondent's equivocation impugns his reliability as a witness on this issue; meanwhile, even though Nguyen has a limited command of English[12] and may not have correctly recalled the precise terms used by Respondent, we find Nguyen credible and we believe his testimony that he did not realize Respondent had failed to comply with court directives.

■ The People allege Respondent failed to keep Nguyen reasonably informed about the status of his matter in violation of Colo. RPC 1.4(a)(3) by neglecting to explain the circumstances underlying the case's dismissal. We are troubled by Respondent's poor communication with Nguyen. Respondent may have briefly referred to his mistakes in informing Nguyen of the dismissal, but it is clear to us that Respondent did not explain those circumstances in a manner Nguyen understood. And while Nguyen's limited English skills could have made it difficult for Respondent to relate complex legal concepts, he surely could have made plain that he had erred by not filing the status report and missing the status conference. By failing to do so, Respondent acted without the level of professionalism and transparency we would expect.

Yet we are not persuaded that Respondent's incomplete communication regarding the dismissal amounted to a rule violation. Colorado Ethics Opinion 113 provides:

> When, by act or omission, a lawyer has made an error, and that error is likely to result in prejudice to a client's right or claim, the lawyer must promptly disclose the error to the client. "Error," as used in this opinion, is not meant to include an act

or omission that a reasonable lawyer would conclude would not likely result in prejudice to a client's right or claim.[13]

Here, Nguyen's claims probably were no longer viable at the district court level when the court ordered Respondent to prepare the status report. By then, the court had granted motions for summary judgment or dismissal of E–470, CDOT, Ideal, and ACC. It appears that the court directed Respondent to prepare a status report in order to tie up loose ends and that the case soon would have been dismissed even if Respondent had filed the status report and attended the status conference. Thus, Respondent's inattention to these court directives, like "missing a non-jurisdictional deadline, a potentially fruitful area of discovery, or a theory of liability or defense," appears to fall under the category of errors that "may constitute grounds for loss of sleep, but not an ethical duty to disclose to the client."[14] In sum, Respondent's failure to share with Nguyen non-prejudicial information about the representation did not amount to a violation of Colo. RPC 1.4(a)(3).

■ Nor do we find clear and convincing evidence that Respondent misrepresented facts concerning the case's dismissal to Nguyen in violation of Colo. RPC 8.4(c). While Respondent certainly did not communicate with Nguyen as clearly as best practices would dictate, we find it entirely possible Respondent made a reference to his non-compliance with court directives that Nguyen simply did not understand. In short, we are not persuaded that Respondent meant to deceive Nguyen or that his conduct rose to the level of recklessness.[15]

■ In August 2009, Nguyen asked Respondent to return his case file, a camcorder, and a videotape containing accident scene footage he had taken shortly after his son's

---

11. Complaint ¶ 36; Answer ¶ 1. In addition, Respondent could not remember having given Nguyen a copy of the court's order of dismissal.

12. Although Nguyen testified through an interpreter at the disciplinary hearing, he said he understood a fair amount of English.

13. Colo. Bar Ass'n Ethics Comm., Formal Op. 113 (2005).

14. *Id.*

15. The element of scienter, at minimum, must be present to support an alleged violation of Colo. RPC 8.4(c). *People v. Rader,* 822 P.2d 950, 953 (Colo.1992).

accident.[16] Although Nguyen made ten or fifteen separate entreaties, Respondent did not provide the requested items. He responded once to Nguyen, explaining by telephone that he was working on finding the file. At the disciplinary hearing, Respondent explained he did not promptly return Nguyen's file because it was in storage and he had trouble locating it. In addition, Respondent contends Nguyen never gave him a camcorder or videotape in the first place, noting that these items do not appear on the list of disclosures and exhibits he maintained. On this score, we find Nguyen's testimony more credible, due not only to his manner and demeanor on the witness stand, but also due to his specific recollection with respect to the video equipment.

After months of fruitless attempts to obtain his file, Nguyen paid Cindy Dang, Esq., ("Dang") $200.00 to assist him in that effort. On November 10, 2009, Dang wrote to Respondent, seeking the return of Nguyen's file.[17] On November 19, 2009, she spoke by telephone with Respondent, who agreed to restore Nguyen's file within five days.[18] When he failed to do so, Dang wrote a follow-up letter.[19] Respondent's continued failure to produce the file led Dang to recommend that Nguyen file a complaint with the People. After Nguyen lodged a complaint with Dang's assistance, Respondent returned the file on February 19, 2010, though the videotape and camcorder were not included. Dang wrote again to Respondent on March 11, 2010, asking for the video equipment, but Respondent never produced it.

The People contend Respondent violated Colo. RPC 1.4(a)(4) and 1.16(d) by failing to return Nguyen's file and video equipment upon request. Colo. RPC 1.4(a)(4) requires lawyers to promptly comply with reasonable requests for information, while Colo. RPC 1.16(d) requires a lawyer, upon termination of representation, to take steps reasonably practicable to protect a client's interests, such as surrendering papers and property to which the client is entitled. Respondent had a responsibility to store client files and property in an organizational system that would enable him to promptly locate and return them upon a client's request. Respondent's failure to return Nguyen's video equipment and his six-month delay in returning Nguyen's file, which forced Nguyen to hire another attorney to assist in recovering his file, represents a dereliction of Respondent's duties under Colo. RPC 1.4(a)(4) and 1.16(d).

### Representation of Barnes

Barnes hired Respondent in March 2007 to represent her in a personal injury lawsuit against Jeremy Morrey ("Morrey"), a motorist who struck her vehicle. Barnes, who is in her mid-eighties, testified that, from the outset, she had great difficulty in eliciting information about her case from Respondent. She claims to have heard nothing from him for nearly a year after retaining him, despite calling his work and cell phones weekly. He finally responded to a letter she wrote in early 2008, in which she sought a release from their contract. According to Barnes, Respondent called her to say he had not received her earlier messages and had been addressing a problem with his mother, but he vowed to turn his attention to her case. Barnes agreed to let him continue the representation, and she then began to receive "sporadic" communication from him. However, she testified that he did not meet with her prior to her deposition and she was very distressed when he arrived at the deposition nearly an hour late without alerting her or his staff.

Respondent offers a somewhat different version of these events. Contrary to Barnes's recollection, he testified that he took photographs and obtained documents at a visit to her home on May 22, 2007, and he then interviewed her and collected information at her home on November 30, 2007. When they next met in March 2008, he explained to her that, among other actions, he had obtained relevant records and had sent notices to subrogation carriers. His notes

---

16.  Nguyen made this request after having decided not to pursue an appeal.

17.  Ex. 20.

18.  Ex. 21.

19.  *Id.*

show that he again visited her home on May 19, 2008, at which time he documented how her injuries had impaired her regular activities. We find Respondent's testimony regarding his visits to Barnes's home to be credible.

On November 5, 2008, Respondent filed a complaint on Barnes's behalf in Denver District Court.[20] A settlement conference was held on September 14, 2009. Barnes attended the conference with Respondent, but she testified that she "just sat there" and no one talked to her. She also testified that she signed the settlement documents without receiving an explanation of what they meant. Respondent, by contrast, averred that he reviewed the settlement documents with Barnes by telephone before his assistant brought them to her home for her signature on November 2, 2009. We credit Respondent's testimony that he spoke with Barnes about the settlement documents before she signed them, though we also believe Barnes's testimony that she did not receive a full and clearly comprehensible explanation regarding the documents.

Under the terms of the settlement, Farmers Insurance agreed to pay Barnes $35,000.00 on Morrey's behalf.[21] That figure was subject to a $22,510.00 lien held by Hartford Underwriters Insurance Company ("Hartford") and a $12,953.50 lien held by Kaiser Colorado Foundation Health Plan ("Kaiser"). On November 2, 2009, the day Barnes signed the settlement documents, Respondent deposited Barnes's settlement check for $35,000.00 into his COLTAF account and paid himself $11,666.66, his one-third share of the settlement proceeds based upon his contingency fee agreement with Barnes.

From November 2009 to January 2010, Respondent endeavored to reduce the two outstanding liens. He first settled the Hartford lien on January 10, 2010, for $4,502.00.[22] Respondent claims he told Barnes at the time of the settlement and in January 2009 that he needed to resolve subrogation issues before giving her a check. But Barnes's testimony indicated that she had not understood her receipt of settlement funds would be delayed, and she became concerned in early 2010 when no settlement check had arrived. On February 2, 2010, Barnes complained to the People about Respondent, and the next day she mailed Respondent a letter requesting her settlement share.[23] On February 5, 2010, Respondent sent Barnes a disbursement statement and a letter, explaining that he could not disburse the final sum to her until he resolved the outstanding Kaiser lien, a process that had been delayed when an adjuster took an extended leave.[24] On February 11, 2010, Respondent settled the Kaiser lien for $1,050.00 [25] and delivered to Barnes a check for $15,175.96.[26]

■ The People allege Respondent violated Colo. RPC 1.4(a)(3) and 1.4(a)(4) by failing to keep Barnes reasonably informed about the status of the settlement funds and liens, as well as by neglecting to respond to her reasonable requests for information. While we do not believe Respondent wholly abdicated his responsibility to share information with Barnes, his communication with her did not meet the standards expected of Colorado lawyers. Indeed, during the initial portion of the representation, Barnes grew so frustrated with Respondent's inaccessibility that she wished to terminate his services. Although Respondent's communication efforts improved in 2008, he did not adequately prepare Barnes for her deposition or the settlement conference, nor did he sufficiently explain the relevant issues to her during the conference. Therefore, we find that Respondent did not abide by his duties under Colo. RPC 1.4(a)(3) and 1.4(a)(4).

The PDJ previously entered summary judgment for the People on their Colo. RPC 1.15(i)(3) claim, which they pled under the

20. Ex. 5 at 5.

21. Ex. 6.

22. Ex. C.

23. Ex. 36.

24. Ex. 7.

25. Ex. G.

26. Complaint ¶¶ 106–107; Answer ¶ 1.

rubric of the Barnes matter.[27] As noted in the order granting summary judgment, Respondent admits he violated this rule by making four cash withdrawals totaling $1,700.00 from his COLTAF account between October 2009 and March 2010.[28]

■ The People also allege Respondent violated Colo. RPC 1.15(a), which requires a lawyer to "hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property," by making approximately $2,000.00 in payments to Sprint and LexisNexis out of his COLTAF account. Respondent concedes his office acted inappropriately by paying several office bills from his COLTAF account, although he does not agree that these actions amount to impermissible commingling of lawyer and client funds, as the People assert.

As the PDJ noted in his summary judgment order, Respondent's payments to Sprint and LexisNexis from his trust account suggest that, for at least a brief period between the moment at which he earned legal fees and the time at which he paid the bills, he kept funds belonging to him in his trust account. But the requirement under Colo. RPC 1.15(a) that lawyers transfer earned fees out of their trust accounts[29] does not mean lawyers must execute the nearly impossible feat of instantaneously transferring such fees. Indeed, lawyers for the People have taken the position that attorneys must transfer earned fees out of their trust accounts within ninety days of completing the underlying work.[30] Thus, the fact that earned fees remained in Respondent's trust account for a certain period of time does not necessarily amount to a violation of Colo. RPC 1.15(a).

Nor does it appear that the direct nature of Respondent's transfers to Sprint and LexisNexis gives rise to a violation of Colo. RPC 1.15(a). The Hearing Board is aware of no legal authority establishing that Colo. RPC 1.15(a) bars a lawyer from paying a personal or office bill from earned fees via direct transfer from a trust account. More relevant to this issue is Colo. RPC 1.15(d)(2), which requires a lawyer to maintain a business account "into which all funds received for professional services shall be deposited."[31] Here, because Respondent directly paid Sprint and LexisNexis from his trust account, it appears he never deposited those funds into his business account, as required by Colo. RPC 1.15(d)(2). Given that the People improperly pled Claim VIII, we find no violation of Colo. RPC 1.15(a).

### Representation of Justi

On July 16, 2007, Alaurice Tafoya–Modi, Esq., ("Tafoya–Modi") filed a complaint on behalf of Justi in Grand County District Court. After Tafoya–Modi withdrew from the case, Respondent entered his appearance on Justi's behalf on May 23, 2008. Justi ruptured his quadriceps muscle after falling down a stairway in a Winter Park condominium in 2005, and he claimed RHO Condominium Association ("RHO") was liable for the stairway's dangerous condition. Stuart Morse ("Morse") represented RHO and Condominium Management Company ("CMC"), which RHO had retained to manage the building where Justi fell and which Respondent named as a second defendant in an amended complaint.

RHO filed a motion for summary judgment on May 30, 2008,[32] to which a response was

---

27. Order Re: Complainant's Mot. Summ. J.

28. *Id.*; Complaint ¶¶ 114–117; Answer ¶ 1.

29. *See People v. Shidler*, 901 P.2d 477, 479 (Colo. 1995) ("Permitting earned fees (which are the property of the lawyer)[] to accumulate in an account containing unearned or advance fees (which remain client property until earned), as well as other client funds, constitutes commingling.").

30. James S. Sudler, *Problems with Trust Accounts that Come to the Attention of Regulation Counsel*, 34 COLO. LAW. 39 (Apr. 2005).

31. *See also id.* (citing Colo. RPC 1.15(f)(2) (1995), the precursor to Colo. RPC 1.15(d)(2), in support of the proposition that a lawyer cannot write a check on a trust account to pay for personal insurance but instead "must first transfer the earned fees by check from the trust account to the office or professional account").

32. Ex. 9 at 28.

due on June 17, 2008.[33]  On June 18, 2008, Respondent successfully sought a ninety-day extension of time to file the response.[34]  Although the new deadline was October 11, 2008, Respondent did not file the response until October 27, 2008.[35]  The court granted RHO's motion for summary judgment but later reversed that decision upon consideration of a C.R.C.P. 60 motion Respondent filed.[36]

On November 4, 2008, CMC filed a motion for summary judgment and dismissal, arguing it had no actual knowledge of any alleged defect in the stairway, as would be required to support Justi's claim under the Colorado premises liability statute.[37]  Respondent did not file a response on Justi's behalf, and the court entered summary judgment for CMC on December 3, 2008.[38]

During the extensive motions practice leading up to trial in Justi's case, Respondent failed to respond to numerous other motions filed by the defense, including a motion to strike a designated expert,[39] two motions in limine to exclude evidence,[40] and a motion to strike a claim for economic damages.[41]  The court granted in full or in part several of those motions.  (Respondent's pattern of non-response also continued after trial, when he neglected to respond to a motion for attorney's fees[42] and a bill of costs.[43])  At the disciplinary hearing, Respondent explained that his strategy in this case was to "stay small" and that he made calculated decisions not to contest certain motions he adjudged indefensible.  Yet he also admitted it was irresponsible not to have confessed those motions.

Trial was held in Justi's case before Judge Mary Hoak on January 25 and 26, 2010.[44]  On the second day of trial, after Respondent questioned his last witness, Judge Hoak asked Respondent if he wished to rest.  He responded he did not intend to rest but he had no further witnesses at the time.  After Judge Hoak instructed Respondent that he was obligated to rest if he had no additional evidence to present, Respondent agreed to rest.

Morse then moved for a directed verdict, arguing that (1) Respondent had failed to present any evidence of a connection between RHO and the condominium at which Justi fell and (2) Respondent had presented no evidence showing RHO had unreasonably failed to exercise the requisite standard of care.  Respondent replied that evidence presented by a defense witness would show RHO owned the condominium in question.  But Judge Hoak found that Respondent had the burden to present such evidence in his case-in-chief.  Respondent then moved to reopen his case, explaining that he had relied on Morse's prior representation he would call a representative of RHO as a witness, and that Respondent intended to prove ownership by questioning that witness.  But Morse denied having promised to call any such witness.  Judge Hoak determined there was no legal basis for reopening the evidence, and she granted Morse's motion for directed verdict.

The court of appeals affirmed Judge Hoak's decision not to reopen the evidence.[45]  The appeals court held that, even had RHO been bound by representations made in its

33.  Complaint ¶ 7; Answer ¶ 1.

34.  Complaint ¶ 8; Answer ¶ 1.

35.  Complaint ¶¶ 10–11; Answer ¶¶ 1–2.

36.  Ex. 9 at 20.  The court granted summary judgment on the basis of Respondent's failure to attach certain exhibits to his filing but later discovered that a court clerk originally erred in rejecting those exhibits.

37.  Ex. 10.

38.  Ex. 9 at 23.

39.  *See* Ex. 23.

40.  *See* Exs. 24–25.

41.  *See* Ex. 27.  In the order granting RHO's motion to strike Justi's claim for economic damages, the court noted that Justi had failed to comply with its prior order to provide specific documents to the defense.

42.  *See* Ex. 29.

43.  *See* Ex. 18.

44.  Ex. 10 at 12.

45.  Ex. 35.

opening argument and answer as to its ownership of the condominium, as Respondent argued for the first time on appeal, a directed verdict still would have been appropriate because Respondent had not shown that RHO failed to exercise reasonable care.[46] In addition, the court of appeals found no error in the lower court's denial of Respondent's C.R.C.P. 60(b) motion, noting that he "offered no applicable evidence or authority to support a contention that the circumstances presented here were such that a reasonably prudent person similarly would have neglected to put on a prima facie case before he or she rested." [47]

■ The People allege Respondent violated his duty under Colo. RPC 1.1 to competently represent Justi by failing to respond to defense motions and neglecting to subpoena an essential witness for trial. They further allege that this conduct—along with Respondent's failure to take any depositions—amounted to a lack of diligent and prompt representation in violation of Colo. RPC 1.3. We agree with the People as regards these claims. Even though "staying small" may have been a legitimate strategy, it was irresponsible for Respondent to simply ignore multiple motions filed by the defense. As Judge Hoak noted, it is "very unusual" for a lawyer to overlook numerous motions, and some of the motions Respondent disregarded were significant to the resolution of the case. In addition, Respondent acted without the requisite promptness by requesting an extension of time to respond to RHO's motion for summary judgment after the deadline had passed, then only to file his response sixteen days past the extended deadline.

We also find that Respondent's conduct addressed in RHO's motion for a directed verdict did not meet applicable standards of diligence and competence. It is unclear to us, given the limited record available, whether Respondent intended to demonstrate a connection between RHO and the condominium by calling a witness he expected Morse to make available in the course of Respondent's case-in-chief, or rather if he intended to directly examine that witness during the de-

fense. The safest course of action would have been to subpoena the witness, but we do not entirely discount Respondent's argument that it is common practice for counsel to agree to make witnesses available to testify without a subpoena. However, if Respondent needed to question a certain witness to establish a prima facie case and either he or Morse did not wish to issue a subpoena, he should have secured an agreement with Morse ensuring the witness's presence during the relevant portion of the trial. If he meant to directly examine the witness during the defense, he also should have secured Morse's agreement not to move for a directed verdict. Finally, we find the court of appeals' reasoned determination that Respondent failed to establish a required element of his prima facie case to be persuasive evidence of his failure to act with the requisite diligence and competence. Accordingly, we find Respondent violated Colo. RPC 1.1 and 1.3.

■ In addition, the People assert Respondent violated his duty under Colo. RPC 1.4(a)(3) to keep Justi reasonably informed about the case by failing to alert Justi that he was not responding to defense motions, that CMC's motion to dismiss had been granted due to his lack of response, and that he had not planned to subpoena an essential witness. In their hearing brief, the People maintain that Respondent previously admitted he did not uphold his duty to communicate with Justi. But Respondent's answer contains no such admission, nor does his testimony provide any indication of inadequate communication to Justi. And Justi himself did not testify at the disciplinary hearing to corroborate the People's assertion. Given the dearth of evidence that Respondent neglected to keep Justi informed about his case, we find no violation of Colo. RPC 1.4(a)(3) here.

The People also allege two claims concerning judgments owed in the Justi matter. Between September 9, 2008, and May 14, 2010, Judge Hoak entered four judgments against

46. *Id.* at 8–9.

47. *Id.* at 12.

Justi in the amounts of $25,086.97,[48] $901.00,[49] $1,001.00,[50] and $918.83,[51] and she also entered a judgment against Respondent for $422.00 in attorney's fees.[52]

On December 6, 2010, the People informally interviewed Respondent regarding the Justi matter. Respondent was asked whether the judgments owed in that case had been paid. According to the testimony and notes of Laurie Seab, the People's investigator, Respondent said, "I think I paid" the judgments, and then he stated, "we paid all of them."[53] But the register of actions in the Justi case showed that none of the judgments had been paid.[54]

The People claim Respondent violated Colo. RPC 8.1(a), which provides that a lawyer shall not knowingly make a false statement of material fact in connection with a disciplinary matter, by telling the People the judgments in the Justi case had been paid. The People further assert that Respondent violated Colo. RPC 8.4(c) by misrepresenting to the People that the judgments against himself and Justi had been satisfied.

According to Respondent, he said during the interview that he thought the judgments had been paid because he truly believed that to be case. In addition, he did not think the People's question encompassed the defense's $25,086.97 bill of costs, since the case was on appeal and the bill of costs was not yet properly considered an unsatisfied judgment. Respondent also noted that at the time of the interview he was taking prescription pain medication to ease his recovery from hip surgery.

■ We cannot find that Respondent possessed the state of mind required to support a violation of Colo. RPC 8.1(a) or 8.4(c). By its terms, Colo. RPC 8.1(a) encompasses situations in which a lawyer *knowingly* makes a false statement of material fact. And the Colorado Supreme Court has determined that the element of scienter must be proved to give rise to a violation of Colo. RPC 8.4(c).[55] Respondent made the comments at issue without having received prior warning that he would be asked about the judgments and without the benefit of documentation available for his review. And rather than categorically and firmly asserting that the judgments had been paid, Respondent prefaced his comments by saying he "thought" they had been paid. As such, we do not find clear and convincing evidence of the state of mind necessary to sustain the People's claims under Colo. RPC 8.1(a) and 8.4(c).

### Representation of Caraghar

While riding her bicycle in Denver on September 4, 2008, Caraghar was struck by a car, injuring her shoulder. On September 15, 2008, she hired Respondent on a contingency basis to file claims against the driver of the vehicle who hit her and the driver's insurer.[56] Shortly thereafter, Caraghar accompanied Respondent's paralegal to the accident site, where he took photographs. Caraghar testified that she promptly visited an orthopedist and sent Respondent copies of her MRI results and photographs of her wounds.

Caraghar then experienced a "great deal" of trouble in contacting Respondent to check on the status of her case. Within a few months, she concluded he was "not interested" in talking to her because, even though she called his office weekly, her messages often were not returned. When she "eventually" received his cell phone number, she was able to speak to him a couple of times, but it

48. Ex. 18.

49. Ex. 32.

50. Ex. 33.

51. Ex. 34.

52. Ex. 29.

53. Ex. 37.

54. Ex. 9 at 31–32. In fact, the $422.00 judgment had been garnished from Respondent's bank account. *See* Exs. 38–39.

55. *Rader*, 822 P.2d at 953. "[T]he element of scienter is shown with respect to a violation of [the predecessor to Colo. RPC 8.4(c)] when it is established that the attorney deliberately closed his eyes to facts he had a duty to see or recklessly stated as facts things of which he was ignorant." *Id.* (internal quotation omitted).

56. Ex. 22.

appeared that he did not remember the facts of her case. Respondent informed Caraghar on one occasion that he had sent relevant documentation ·to the driver's insurer, although she did not receive copies of those materials. As time passed, their communication deteriorated further, such that, in Caraghar's view, "there was absolutely no response at all."

Respondent concedes that some of Caraghar's messages went unanswered and that communication problems occurred in the spring and early summer of 2010. He said Caraghar had "every right to feel upset" with him because he did not have a good plan for how to stay in touch with clients when he was out of the office. However, he rejects her claim that he was unfamiliar with her case. Respondent recalls that he spoke with Caraghar multiple times about his communication with the insurance adjuster, subrogation issues, and the proper timeframe for resolving her case. According to Respondent, if Caraghar were to undergo surgery after having settled the case, she would be obligated to reimburse her insurer for all of the costs of the surgery. Respondent testified that he explained to her the importance of reaching maximum medical improvement and deciding whether to have surgery before negotiating a settlement.

On July 13, 2010, Caraghar sent Respondent a letter by certified mail, noting that she had been unable to reach him by phone and that messages she left on his office and cell phones had educed no response.[57] She stated, "On those few occasions when I have managed to speak with you, you have offered assurances that you have made progress with the insurance company and should be hearing something soon, but as the months, and now almost 2 years go by, my confidence in your efforts has been shaken."[58] She therefore asked Respondent to provide her an accounting of the work he had performed on her behalf within two weeks.[59]

Caraghar did not receive a response from Respondent within the two-week period, so on August 12, 2010, she requested that the People investigate the matter. She explained at the disciplinary hearing that she contacted the People because she felt "abandoned" and she wanted help extricating herself from her contract with Respondent.

On August 21, 2010, after receiving both a letter from the People and a copy of Caraghar's grievance, Respondent contacted Caraghar.[60] According to Respondent, they then met to review his progress and their plan of action, and he believed he had reassured her that her case was progressing. Respondent testified that he and Caraghar prepared a settlement offer of $75,000.00 and that they received an initial counter-offer of approximately $4,000.00 and a second counter-offer of $6,000.00. Respondent contends Caraghar refused to accept this amount, while Caraghar recalls Respondent adjudged the offer inadequate. Respondent testified that he then advised Caraghar to determine whether her shoulder had been permanently injured; on that recommendation, she again visited an orthopedist, who performed an MRI that revealed additional tearing in her shoulder.

Although Respondent gave some impression of renewing his efforts on Caraghar's case, she did not trust that he was in fact doing so. As a result, she consulted with another attorney, with whose assistance she terminated Respondent's representation in February 2011. The statute of limitations for Caraghar's claims was to run in early September 2011, but as of the disciplinary hearing, her case remained unresolved.

The People allege Respondent acted without the requisite diligence and promptness in representing Caraghar in violation of Colo. RPC 1.3. Specifically, they claim that Respondent made no significant progress on her case over a period of two years and that he failed to request copies of her medical records from her treating physician. But the People did not adduce any evidence or elicit any testimony showing that Respondent failed to request copies of Caraghar's

---

57. Ex. 19.

58. *Id.*

59. *Id.*

60. Complaint ¶ 113; Answer ¶ 1.

medical records; to the contrary, Respondent testified that he had in fact obtained those records. Nor did the People clearly and convincingly demonstrate that Respondent's efforts on Caraghar's behalf were dilatory. Respondent testified that settling too soon would place Caraghar at financial risk because expenses from any subsequent surgery would come out of her own pocket. Given the evolving nature of Caraghar's injury reflected in her 2010 MRI, Respondent's argument appears to be logical, and the People have not provided us any basis to determine that this strategy was detrimental to Caraghar. Thus, we find no violation of Colo. RPC 1.3.

■ We have little trouble, however, concluding Respondent breached his duties to communicate with Caraghar. Although Respondent's communication efforts may have passed muster during certain portions of the representation, he utterly failed in that regard in the spring and summer of 2010. As Respondent admitted, a number of Caraghar's calls went unanswered and he did not timely respond to the letter she wrote him on July 13, 2010, in which she requested an accounting of his work on her case. We find this conduct amounts to a violation of Colo. RPC 1.4(a)(3) and 1.4(a)(4).

## IV. SANCTIONS

The American Bar Association *Standards for Imposing Lawyer Sanctions* (1991 & Supp. 1992) ("ABA *Standards*") and Colorado Supreme Court case law govern the selection and imposition of sanctions for lawyer misconduct. ABA *Standard* 3.0 mandates that, in selecting the appropriate sanction, the Hearing Board consider the duty breached, the injury or potential injury caused, Respondent's mental state, and the aggravating and mitigating evidence.

### ABA *Standard* 3.0—Duty, Injury, and Mental State

■ *Duty:* By failing to provide diligent and competent representation, Respondent violated his duties to his clients. He also neglected his obligation to communicate with his clients about the status of their matters and to respond to their requests for informa-

tion. Moreover, he jeopardized the security of his clients' funds by making unauthorized cash withdrawals from his COLTAF account. Finally, Respondent violated the duties he owes as a professional by neglecting his obligation to timely return client files and property upon termination of representation.

■ *Injury:* Respondent caused some injury to Nguyen by forcing him to expend considerable effort, as well as $200.00, to seek restoration of his file and property, which he values highly. In the Barnes matter, Respondent's inadequate communication injured Barnes by keeping her in the dark about the status of her case and Respondent's efforts on her behalf. Respondent's failure to share information caused Barnes sufficient frustration that she sought to terminate their relationship. In addition, Respondent caused potential injury to Barnes and other clients by failing to safeguard their funds.

Judge Hoak testified that Respondent's failure to diligently represent Justi deprived him of a "fair shake." Although Justi may not have prevailed in his lawsuit, he deserved his day in court, and Respondent's misconduct caused him potential injury by foreclosing that possibility. Finally, Respondent's inadequate communication with Caraghar caused her aggravation and anxiety. As in the Barnes matter, Caraghar was so frustrated by her inability to learn of the status of her case that she sought to terminate Respondent's services.

■ *Mental State:* We find that Respondent's violations of Colo. RPC 1.1, 1.3, and 1.16(d) in the Nguyen and Justi matters were negligent. Respondent departed from the standard of care a reasonable lawyer would exercise by failing to keep track of required actions in the Nguyen matter and by relying on opposing counsel to call a critical witness in the Justi matter. In addition, we believe Respondent acted negligently in failing to promptly locate and restore Nguyen's file and property upon termination of representation. But we find that Respondent knowingly transgressed Colo. RPC 1.4(a)(3), 1.4(a)(4), and 1.15(i)(3). Although Respondent certainly lacked a conscious objective to harm his

clients or to violate the Rules of Professional Conduct, we believe he was aware of the nature of his conduct in regard to each of these rules.[61]

We also take this opportunity to note that Respondent's testimony evinced a certain lack of appreciation for the central role in the attorney-client relationship of communication and consultation with clients.[62] For instance, Respondent made an offhand comment that he knew more about Caraghar's case than she did, which inappropriately discounted his client's vital knowledge and opinions. He also mentioned that he "notified" Caraghar of their plan of action, thereby improperly suggesting that he had the right to unilaterally make critical decisions about case strategy.[63] Although we realize Respondent might have chosen different phrasing in a less stressful setting, we are concerned that his comments, coupled with the evidence that his clients felt abandoned, reflect a somewhat cavalier and disengaged approach toward representing clients.

### ABA *Standard* 9.0—Aggravating and Mitigating Factors

Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed, while mitigating factors may justify a reduction in the severity of the sanction. The Hearing Board considers evidence of the following aggravating and mitigating circumstances in deciding the appropriate sanction.

*Disciplinary Record—9.22(a)/9.32(m):* Respondent received a letter of admonition in 1989 for failure to communicate in two client matters. In addition, Respondent was suspended in 2001 for nine months, all stayed, with two years of probation. In one matter underlying the 2001 suspension, he failed to maintain funds subject to a Medicaid lien in a separate account; in another case, he tendered funds to a client that were due a provider and thus subject to the provider's lien. Although remote offenses typically are not weighed as aggravating factors, we consider Respondent's admonition and suspension in aggravation here because of the similarity in rule violations.

*Dishonest or Selfish Motive—9.22(b)/ 9.32(b):* The People argue Respondent had a dishonest motive, while Respondent contends he lacked any such intent. Although we have found Respondent did not act dishonestly, we are concerned he may have accorded his personal difficulties a higher priority than his clients' cases. Given the lack of persuasive evidence either establishing or negating a selfish motive, we apply neither ABA *Standard* 9.22(b) nor ABA *Standard* 9.32(b) here.

*Pattern of Misconduct—9.22(c):* Respondent's conduct in the Nguyen, Barnes, and Caraghar matters—as well as in the case giving rise to his 1989 letter of admonition—demonstrates a pattern of inadequate communication with clients. In addition, Respondent's accounting mistakes in the Barnes matter and his 2001 offenses, viewed together, suggest an incipient pattern of negligent management of client and third-party funds.

*Multiple Offenses—9.22(d):* Respondent engaged in multiple types of misconduct in the four matters addressed here, ranging from failure to diligently represent clients to insufficient client communication to inadequate safeguarding of client funds.

---

**61.** Respondent's ignorance of the rule barring cash withdrawals from COLTAF accounts does not excuse his violation of the rule or require a finding that his conduct was merely negligent. *See People v. Holmes*, 959 P.2d 406, 414 (Colo. 1998) ("Generally speaking, where the law imposes criminal liability for certain conduct, the scienter element requires no more than that the person charged with the duty knows what he is doing. It does not mean that, in addition, he must suppose that he is breaking the law.") (quotation omitted); C.R.S. § 18–1–504 ("A person is not relieved of criminal liability for conduct because he engages in that conduct under a mistaken belief that it does not, as a matter of law, constitute an offense."). This case and statute directly concern criminal liability, but we also find them relevant to attorney disciplinary proceedings, particularly in light of the Colorado Supreme Court's finding that higher standards for conduct may be imposed upon lawyers than upon lay persons. *See People v. Morley*, 725 P.2d 510, 516 n. 2 (Colo.1986).

**62.** *See* Colo. RPC 1.4.

**63.** Colo. RPC 1.2(a) provides that a lawyer shall consult with a client as to the means by which the client's objectives are to be pursued.

*Obstruction of or Cooperation in the Disciplinary Process—9.22(e)/9.32(e):* The People argue Respondent engaged in bad faith obstruction of this proceeding by failing to provide records concerning his bank accounts and bookkeeping; Respondent, meanwhile, argues that he has provided all of the requested information to which he had access and that he otherwise cooperated commendably with the People. The Hearing Board lacks evidence as to the relative merits of these contentions; thus we apply neither ABA *Standard* 9.22(e) nor ABA *Standard* 9.32(e).

*Substantial Experience in the Practice of Law—9.22(i):* Respondent was licensed to practice law in 1978. We consider his substantial experience as an attorney to be an aggravating factor.

*Personal and Emotional Problems—9.32(c):* Respondent experienced a variety of personal and emotional difficulties in the general timeframe of the misconduct at issue here. He was divorced in 2005 and assumed partial custody of his son and daughter, who are now teenagers. After his practice took a downturn in 2006, he was no longer able to employ skilled secretaries or paralegals, throwing his office management system into disarray. In February 2010, Respondent's daughter witnessed a school shooting in which her friend was injured. On a psychologist's recommendation, he then took his daughter on an extended trip away from Colorado. Respondent also experienced emotional difficulties as a result of the shooting.

We take note of the fact that Respondent's divorce occurred several years prior to the misconduct at issue here, while the school shooting occurred after much of the misconduct had taken place. However, we give some weight to Respondent's personal and emotional problems, particularly in helping to explain the circumstances underlying Respondent's breakdown in communication with Caraghar in the spring and summer of 2010.

*Efforts to Make Restitution or Rectify Consequences of Misconduct—9.32(d):* Respondent asks us to apply this factor in mitigation, noting that he paid Barnes soon after she complained to the People, he returned Nguyen's file shortly after Nguyen contacted the People, and he responded to Caraghar's concerns after her complaint. We do not consider these actions in mitigation because, rather than addressing the outgrowth of his misconduct, his actions simply fulfilled the duties he was originally obligated to perform.

*Character or Reputation—9.32(g):* Although Respondent asks us to apply this factor in mitigation, he presented no supporting evidence. Accordingly, we do not consider this factor.

*Physical Disability—9.32(h):* In late November and December 2009, Respondent suffered from flank pain, a kidney stone, and a herniated disc, which required him to take opiates and limited his ability to work. After undergoing a total hip replacement in September 2010, he could only work part-time until February or March 2011. We accord a limited amount of weight to Respondent's medical issues in explaining portions of the misconduct in the Nguyen, Barnes, and Justi matters.

*Mental Disability—9.32(i):* Although Respondent requests the Hearing Board to consider in mitigation his recent diagnosis of attention deficit disorder, Respondent has not provided the medical evidence and other elements explicitly required by the ABA *Standards* to support application of this factor.

*Remorse—9.32(l):* Respondent testified that Caraghar in particular "had every right to feel upset" with him and that he did not properly keep track of client communication. Yet he admitted no misconduct in the Barnes matter, asserting that he produced a good outcome and adequately communicated with Barnes. More generally, he claimed he has "beaten himself up every day" over the cases at issue here and feels his conduct has not matched up to his pedigree or courtroom skills. We accord a limited amount of weight to remorse as a mitigating factor here. Although Respondent exhibited some compunction, his testimony did not reflect a full understanding of the gravity and consequences of his misconduct.

## Sanctions Analysis under ABA *Standards* and Case Law

The People argue that Respondent's misconduct warrants a suspension for one year and one day, all served.[64] Respondent, on the other hand, proposes that the most fitting sanction in this matter would be a suspension from the practice of law for six months, with five months stayed pending successful completion of a two-year period of probation with the following conditions: that he avail himself of a trust account monitor and a practice monitor; that he continue medical treatment; and that he attend trust school and ethics school.

Several ABA *Standards* guide our analysis of the appropriate sanction in this matter. We find ABA *Standard* 4.43 applicable to Respondent's violations of Colo. RPC 1.1 and 1.3.[65] This standard provides that public censure is generally appropriate when a lawyer is negligent and does not act with reasonable diligence in representing a client, thereby causing a client injury or possible injury. With respect to Respondent's dereliction of his duties to communicate under Colo. RPC 1.4(a)(3) and 1.4(a)(4), suspension is the appropriate presumptive sanction pursuant to ABA *Standard* 4.42, given Respondent's knowing state of mind. As regards Respondent's violation of Colo. RPC 1.15(i)(3), ABA *Standard* 4.12 provides that suspension is generally appropriate when a lawyer knows or should know he is dealing improperly with client property and causes the client injury or potential injury. Finally, the standard applicable to Respondent's violation of Colo. RPC 1.16(d) is ABA *Standard* 7.3, which holds that public censure is generally appropriate when a lawyer negligently breaches a duty owed as a professional and thereby causes injury or potential injury to a client. Taken together, the applicable ABA *Standards* indicate suspension is the presumptive sanction here.

Colorado Supreme Court case law supports imposition of a sanction less severe than a fully served suspension for one year and one day, as the People request. In cases involving the type of misconduct at issue here, suspensions lasting one year or longer typically have addressed instances of particularly serious neglect and resulting grave injury. For example, in *People v. Rishel*, the Colorado Supreme Court suspended for one year and one day a lawyer who engaged in significant neglect of two client matters.[66] In the first matter, the lawyer failed to notify his client of a hearing concerning motions to modify child support and visitation and to hold the client in contempt; the client was forced to hire another attorney when she by chance learned of the hearing two days before it occurred.[67] In addition, the lawyer never refunded unearned fees, provided a requested accounting, or moved to withdraw from the client's representation.[68] This conduct violated Colo. RPC 1.3, 1.4(a), 1.15(b), and 1.16(d).[69] In the second client matter in *Rishel*, the attorney never responded to a client's requests for the return of his file, for an accounting, and for a refund of unused fees, in violation of Colo. RPC 1.4(a), 1.15(b), and 1.16(d).[70]

As another example, the Colorado Supreme Court suspended for a year and a day a lawyer who engaged in serious misconduct with respect to two clients in *People v. Johnson*.[71] In the first client matter in *Johnson*, the attorney failed to safeguard client funds, failed to file an opening brief, leading to a

---

64. The People's requested sanction is premised in part upon alleged violations of Colo. RPC 1.15(a), 8.1(a), and 8.4(c), which the Hearing Board concludes have not been proved.

65. Appendix 1 of the ABA *Standards* suggests that ABA *Standard* 4.5 governs violations of Colo. RPC 1.3. ABA *Standard* 4.5 addresses a lawyer's representation of a client in a legal area in which the lawyer lacks sufficient skill or understanding. Here, Respondent's violation of Colo. RPC 1.1 involved lack of thoroughness and preparation, rather than lack of knowledge and skill, so we deem ABA *Standard* 4.4 more relevant.

66. 956 P.2d 542, 542 (Colo.1998).

67. *Id.* at 543.

68. *Id.*

69. *Id.*

70. *Id.*

71. 944 P.2d 524, 525 (Colo.1997).

subsequent determination that the client received ineffective assistance of counsel, refused to provide a written accounting upon request, failed to surrender client funds upon termination of representation, and committed negligent conversion of client funds, thereby violating Colo. RPC 1.3, 1.4, 1.15(a), 1.15(b), 1.16(d), and 8.4(h).[72] In addition, the attorney in *Johnson* violated Colo. RPC 8.4(d) and the predecessor to Colo. RPC 1.3 in a second client matter when he failed to prosecute his clients' case, leading to its dismissal, and then, in the course of his clients' malpractice action, failed to appear for his deposition, neglected to answer written discovery, and delayed two years in paying attorney's fees he owed.[73]

Like the ABA *Standards,* Colorado Supreme Court case law recognizes that a public censure would not appropriately account for the gravity and extensive nature of the misconduct at issue in the case before us. The Colorado Supreme Court has typically imposed a public censure when attorneys have neglected client matters to a limited extent. For instance, the Colorado Supreme Court approved imposition of a public censure in *People v. Barbieri* for violations of Colo. RPC 1.3 and 1.4(a) in just one client matter.[74]

As indicated by this summary of case law, the appropriate sanction for misconduct comparable to that presented here is a short suspension. Our analysis of the applicable aggravating and mitigating factors does not alter that conclusion; however, Respondent's pattern of misconduct and prior disciplinary record persuade us it is imperative to impose a meaningful period of served suspension and to institute mechanisms for ensuring Respondent improves his skills at office management, accounting, and client relationships.

■ We conclude the appropriate sanction is a suspension for nine months, with three months served and six months stayed

pending the successful completion of a two-year probationary period with the following conditions: that Respondent avail himself of a trust account monitor and a practice monitor; that he continue medical treatment; that he attend trust school and ethics school; and that he engage in no further violations of the Rules of Professional Conduct. In reaching this conclusion, we find Respondent eligible for probation pursuant to C.R.C.P. 251.7(a) because he is unlikely to harm the public during the probationary period and can be adequately supervised, he can practice law without causing the profession or courts to fall into disrepute, and he has committed no acts warranting disbarment.

## V.  CONCLUSION

Respondent failed to uphold the standards expected of Colorado lawyers by representing clients without the requisite diligence, inadequately communicating with clients, neglecting to safeguard client funds, and unreasonably delaying in returning a client's file. This misconduct appears to stem in part from the loss of skilled assistants previously in Respondent's employ and from personal difficulties, but these circumstances do not excuse the neglect of his duties. Given the pattern of Respondent's misconduct in both this matter and prior cases, we find that protection of the public will be assured by a short, served suspension, followed by a probationary period during which Respondent must comply with conditions designed to ensure he consistently fulfills his professional obligations.

## VI.  ORDER

The Hearing Board therefore **ORDERS:**

1.  **DAVID J. GREENE,** attorney registration number 08994, is **SUSPENDED for nine months, with six months stayed pending successful completion**

72.  *Id.* at 525–26.

73.  *Id.* at 526–27; *see also People v. Fager,* 925 P.2d 280, 281–83 (Colo.1996) (imposing suspension for one year and one day upon lawyer who not only violated Colo. RPC 1.1, 1.3, 1.15(a), and 1.15(b), but who also engaged in dishonesty in violation of Colo. RPC 8.4(c)).

74.  935 P.2d 12, 12–13 (Colo.1997); *see also People v. Field,* 967 P.2d 1035, 1035–36 (Colo.1998) (publicly censuring attorney who violated Colo. RPC 1.3 in just one client matter).

of a two-year probationary period with conditions. The **SUSPENSION SHALL** take effect only upon issuance of an "Order and Notice of Suspension." [75]

2. Respondent shall comply with and pay all costs associated with the following conditions of probation:

a. Respondent shall submit to monitoring by a practice monitor for the two-year probationary period. The monitor shall be a licensed attorney in good standing with the Colorado bar, and Respondent's choice of a practice monitor shall be subject to the PDJ's continued approval. Respondent and the practice monitor shall jointly develop a plan for the monitoring described herein and submit that plan to the PDJ for approval prior to Respondent's reinstatement to the practice of law. Also prior to his reinstatement, Respondent shall execute an authorization for release permitting the monitor to report to the PDJ and the People and requiring the monitor to notify the PDJ and the People if Respondent fails to participate in the required monitoring, or if the monitor reasonably believes Respondent's methods of practice place his clients at risk of harm. Respondent shall consult at least monthly with the practice monitor to review Respondent's management of his caseload, with a focus on his calendaring and "tickler" systems and his communication with clients. The monitor also shall have access to Respondent's financial accounts. The monitor shall submit quarterly written reports regarding Respondent's case management and communication with clients to the PDJ and the People.

b. Respondent shall submit to monitoring by a trust account monitor for the two-year probationary period. The monitor shall be an accountant licensed in Colorado, and Respondent's selection of the monitor shall be subject to the PDJ's continued approval. The monitor shall oversee Respondent's preparation of business tax returns, reconciliation of operating and COLTAF accounts, balancing of ledgers, and performance of general accounting procedures, and the monitor shall generally review Respondent's trust account(s) for compliance with Colo. RPC 1.15. The monitor shall report quarterly to the PDJ and the People as to the status of Respondent's accounting systems. Respondent shall, prior to his reinstatement, execute an authorization for release permitting the monitor to report to the PDJ and the People.

c. Respondent shall continue to seek and follow medical advice to address his concentration and his attention deficit disorder. Respondent agrees to waive physician-client privilege as necessary to permit his physician to make a full report on his status as may be requested periodically by the PDJ and the People.

d. Respondent shall attend and successfully pass the one-day ethics school sponsored by the People prior to his reinstatement to the practice of law. Respondent shall register and pay for ethics school within thirty days of the PDJ's Order and Notice of Suspension in this matter.

e. Respondent shall attend and successfully pass the one-half-day trust account school sponsored by the People prior to his reinstatement to the practice of law. Respondent shall register and pay for trust account school within thirty days of the PDJ's Order and Notice of Suspension in this matter.

f. During the period of probation, Respondent shall not engage in any further violation of the Rules of Professional Conduct.

75. In general, an order and notice of sanction will issue thirty-one days after a decision is entered pursuant to C.R.C.P. 251.19(b) or (c). In some instances, the order and notice may issue later than thirty-one days by operation of C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.

3. Respondent **SHALL** file any post-hearing motion or application for stay pending appeal with the PDJ **on or before October 24, 2011.** No extensions of time will be granted. If Respondent files a post-hearing motion or an application for stay pending appeal, the People **SHALL** file any response thereto within five days, unless otherwise ordered by the PDJ.

4. Respondent **SHALL** pay the costs of these proceedings. The People **SHALL** submit a "Statement of Costs" within fifteen days from the date of this order. Respondent's response to the People's statement, if any, must be filed no later than ten days thereafter.