**PEOPLE**

**v.**

**Lynda Elizabeth CARTER.**

**No. 14PDJ062.**

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

Dec. 16, 2015.

## OPINION AND DECISION IMPOSING SANCTIONS PURSUANT TO C.R.C.P. 251.19(b)

This disciplinary case concerns a recent admittee to the bar who engaged in professional misconduct after opening a solo practice in Pagosa Springs. Lynda Elizabeth Carter ("Respondent") represented a man charged with misdemeanor sexual assault. She failed to safeguard his funds, neglected to properly withdraw from representation, and recklessly converted advance legal fees. In a second representation, Respondent agreed to help a client recover funds from the sale of logging machinery. She did not adequately communicate with the client and did not safeguard his retainer. In addition to this client-focused misconduct, she failed to pay a court reporter's invoice for deposition transcripts. Respondent's misconduct warrants suspension for eighteen months.

## I. *PROCEDURAL HISTORY*

Adam J. Espinosa, of the Office of Attorney Regulation Counsel ("the People"), filed a complaint on July 24, 2014. Respondent failed to submit an answer, so the Presiding Disciplinary Judge ("the PDJ") granted the People's motion for entry of default in September 2014 and subsequently set a sanctions hearing.

In November 2014, the People filed a petition for immediate suspension, premised on some of the same allegations underlying their complaint: that Respondent knowingly converted client funds. She did not respond to the petition or the PDJ's show cause order. On December 17, 2014, the PDJ found reasonable cause to believe that Respondent had knowingly converted unearned retainers from two clients, and the PDJ therefore recommended that the Colorado Supreme Court immediately suspend her. The Colorado Supreme Court accepted that recommendation two days later.

In January 2015, Cameron C. Secrist entered his appearance for Respondent. After obtaining a continuance of the sanctions hearing, he moved to set aside entry of default. The PDJ granted the motion on May 15, 2015, following a motions hearing. As explained in that order, the PDJ determined that the People had not properly served Respondent with the complaint. Secrist filed an answer on May 29, 2015, and then withdrew as Respondent's counsel the next month.

On October 20, 2015, a Hearing Board comprising James D. Brown and John E. Hayes, members of the bar, and William R. Lucero, the PDJ, held a hearing pursuant to C.R.C.P. 251.18. Kim E. Ikeler appeared on behalf of the People, and Respondent appeared pro se. The Hearing Board considered testimony from Jonathan Alford, Zak Brown, Christopher Trimble, Judy Stevens, Jasjit Grewal, Laurie Ann Seab, and Respondent. The PDJ admitted the People's exhibits 1, 13, 23, 28, 30, 34, 36, and 37.

## II. *FACTUAL FINDINGS AND RULE VIOLATIONS*

Respondent took the oath of admission and was admitted to the bar of the Colorado Supreme Court on September 28, 2009, under attorney registration number 41106.

She is thus subject to the jurisdiction of the Colorado Supreme Court and the Hearing Board in this disciplinary proceeding.[1]

### Personal and Professional Background

Respondent opened a solo law office in Pagosa Springs, called 4 Corners Legal Services, upon earning her law license in 2009. She had previously worked in law enforcement for ten years, and she testified that she decided to become a lawyer after seeing how underrepresented people did not get a "fair shake." Her firm offered general legal services, and many of her cases involved foreclosure prevention. She testified that she earned multiple awards for her commitment to pro bono work.

Respondent has three grown children, two of whom are disabled. Her husband divorced her around the time of the events underlying this case.

In late 2012, Respondent was offered a legal position in the district attorney's office in Cortez. She moved from Pagosa Springs to Cortez in November 2012, though her own firm remained open until December 1. After she closed her law practice, Respondent placed her client files in a storage shed. She testified that she could not afford to pay rent on the unit, so the contents of the shed were sold or destroyed. Although the People secured some of the client files relevant to this disciplinary case, those records are incomplete.

Respondent worked for the district attorney from January 2012 through June 2013. That July, she began a non-attorney job as an undersheriff in Montezuma County. This position automatically terminated in January 2015 because the sheriff was not re-elected.

Respondent began exploring jobs in the energy field after her law license was suspended in December 2014, drawing upon her relevant experience and certifications. Between April and September 2015, she worked as a pipeline inspector for the State of Wyo-

ming. She left that position to seek more remunerative work, but—aside from a one-week stint as a contractor in Louisiana—she has since been unemployed. She testified that over the past several years she has struggled to pay her living expenses, in large measure due to her student loan bills. At the time of the disciplinary hearing, Respondent was living at her daughter's home in Cheyenne.

### Alford Matter

Jonathan Alford is a Pagosa Springs resident who worked as a carpenter for many years and then as a licensed massage therapist between 2011 and 2015. In June 2012, Alford was charged with having committed misdemeanor sexual assault at a social gathering. He initially was represented by a public defender and then hired Respondent on July 27, 2012.

Alford and Respondent entered into a fee agreement, which provided:

> The scope of representation includes seeking a reasonable plea agreement or take the case for trial.
>
> RETAINER. Client will deposit with Attorneys the sum of $1500.00. This will be a final payment except expenses as outlined in paragraph 5. Another $1500.00 will be due if this case proceeds to a full trial and witnesses are placed under subpoena.[2]

Alford paid Respondent $1,300.00 on August 3, 2012, and an additional $200.00 about two weeks later.[3] Respondent deposited the $1,300.00 check into her firm's operating account, and she believes she did the same with the $200.00 check.[4] Her trust account had little activity in 2012, and she made no deposits or withdrawals relating to the Alford representation that year. Respondent did not have a COLTAF account.

Respondent officially entered her appearance in Alford's case on September 10, 2012.[5] Both she and Alford testified that it had been

---

1. *See* C.R.C.P. 251.1(b).

2. Ex. 1 at 0003. Respondent never in fact billed Alford for expenses.

3. Ex. 1 at 0005.

4. Ex. 36 at 0736. There is no documentary evidence showing where Alford's $200.00 check was deposited.

5. Ex. 37 at 0783.

difficult to get his public defender to sign a substitution of counsel form. In the meantime, according to Respondent, the judge let her represent Alford in court because he knew the public defender was out of town.

Alford spoke with Respondent a few times about his case between July and September 2012. Respondent also attended three hearings and talked with the prosecutor. She testified that during her representation of Alford, she interviewed witnesses and worked to undermine the accuser's credibility by gathering evidence of her history of dishonesty. Alford corroborated Respondent's testimony that she persuaded a witness for the prosecution to testify instead for Alford.

At some point after retaining Respondent, Alford told her that the Colorado Department of Regulatory Agencies ("DORA") wanted to suspend his massage license while his criminal case was pending. She contacted DORA and persuaded the department not to suspend Alford's license. She did not charge him a specific fee for this assistance. Respondent testified that she and Alford verbally modified the fee agreement so that her DORA-related efforts would be compensated through Alford's second payment of $1,500.00. Alford, in contrast, remembers that Respondent agreed to handle the DORA issue as a favor, and the Hearing Board finds his testimony persuasive.

Trial was set for Alford's case on November 14, 2012. The day before trial, Respondent filed an unopposed motion to continue the trial because she was ill.[6] The court granted the motion and reset the trial for March 2013.[7]

On November 16, 2012, Respondent asked Alford to pay the second $1,500.00 referenced in the fee agreement. According to Alford, Respondent called him from a gas station, asking him to deposit the payment because her debit card had been denied. Respondent disagrees that a debit card denial precipitated her phone call.

Alford immediately hand-delivered a cashier's check to the bank.[8] The deposit was placed into Respondent's personal checking account.[9] Respondent testified that she directed Alford merely to deposit the check, and that the "small hometown bank" must have mistakenly placed the check in her personal account. Alford, on the other hand, testified that Respondent gave him the number for her personal account. The Hearing Board finds Alford's testimony more logical and credible on this point. Even though the bank may have been a "hometown bank," we doubt that a bank teller would have chosen to place a check made out to "4 Corners Legal" into Respondent's personal account. In any event, Respondent concedes that she did not move the $1,500.00 to her trust account once she discovered that it had been placed in her personal account.

By November 30, 2012, Respondent's personal account contained only $133.19, with the remainder of Alford's money having been consumed in large measure by Respondent's debit card withdrawals.[10]

Respondent testified that when she took the position at the district attorney's office, she mailed Alford notice that she could no longer represent him. She recalled having sent "a whole bunch" of such letters to clients. Her motion for withdrawal filed in Alford's case in January 2013 lists Alford on the certificate of service.[11] Alford, meanwhile, testified that Respondent mentioned she was seeking employment with the district attorney's office, and that she might have told him when she actually got the job. But he insisted that she never told him she was withdrawing and that he never received her motion. According to Alford, he only learned of Respondent's withdrawal when he received a call from public defender Zak Brown on a Sunday morning in early February 2013. In that call, Brown said he would represent Alford if he reapplied for public defender

6. Ex. 37 at 0778.

7. Ex. 37 at 0777.

8. *See* Ex. 1 at 0006.

9. Ex. 36 at 0736.

10. Ex. 36 at 0736.

11. Ex. 37 at 0776.

assistance.[12]

Alford then phoned Respondent, who confirmed that she needed to withdraw as his counsel. When Alford explained that he did not want a public defender, Respondent recommended another attorney, Christopher Trimble, whom Alford soon hired for $4,000.00, excluding investigatory expenses. Respondent gave at least some portions of Alford's case file to Trimble. Trimble commented that Respondent had already performed considerable and valuable work on the case, but he believed still more legal and investigative efforts were needed.

Around the time he hired Trimble, Alford requested that Respondent refund his second payment of $1,500.00. He repeated the request two or three times. Alford testified that he understood the payment was, at least in large measure, for trial representation.

Ultimately, in October 2013, the case against Alford was dismissed with prejudice after Trimble successfully moved to preclude the testimony of two witnesses.[13]

The People charge that Respondent violated six Rules of Professional Conduct in the Alford representation.

First, we consider together the charges that Respondent violated Colo. RPC 1.5(f), which provides that a lawyer shall not treat fees as earned until the lawyer has conferred a benefit on the client or performed a legal service, and Colo. RPC 1.15(a) (2008), which requires a lawyer to hold client property separate from the lawyer's own property. At the disciplinary hearing, Respondent testified that she believed she earned Alford's payments upon receipt. She said she understood, based on research and conversations with three other lawyers, that flat fees are earned upon receipt. She also noted that her fee agreement called for payment of the second $1,500.00 only "if this case proceeds to a full trial and witnesses are placed under sub-

poena," [14] and she said that witnesses indeed had been subpoenaed by the prosecution.

 It has been well established in Colorado since 2000 that a lawyer does not earn flat fees upon receipt.[15] Rather, "an attorney earns fees only by conferring a benefit on or performing a legal service for the client." [16] An attorney may earn a fee upon receipt only under narrow circumstances: if the attorney and client enter into an "engagement" retainer whereby the attorney agrees to forgo other possible employment, if the lawyer agrees to make the client's work a top priority, or if the lawyer makes herself unavailable to represent an adverse party.[17] Unless a fee agreement explicitly designates an engagement retainer as such and explains that the retainer is earned upon receipt, it is presumed that an advance fee is a deposit that is not earned upon receipt.[18]

 In this case, the evidence shows that Respondent agreed to represent Alford for a flat fee. Although the fee agreement made Alford's two payments due at a certain time, the fee agreement did not make the payments earned when paid, since Respondent's fee agreement could not override the principles announced in *Sather*. We thus reject Respondent's argument that she earned either of Alford's payments upon receipt.

Moreover, we conclude that at the time Alford paid Respondent, she had not performed sufficient legal services to earn those payments. After hiring Respondent on July 27, 2012, Alford made his initial payment of $1,300.00 on August 3, 2012. The evidence does not show that Respondent had performed $1,300.00 worth of legal services in that short span of time, although we do find that she ultimately earned Alford's initial $1,500.00 payment through her trial preparation work. Nor does the evidence show that Respondent fully earned Alford's second payment of $1,500.00 by the time Alford deposit-

---

**12.** According to Brown, the judge asked him to contact Alford around the time Respondent moved to withdraw.

**13.** Ex. 37 at 0805.

**14.** *See* Ex. 1 at 0003.

**15.** *In re Sather,* 3 P.3d 403, 410–11 (Colo.2000).

**16.** *Id.* at 410.

**17.** *Id.*

**18.** *Id.* at 410–11.

ed that payment in mid-November, or by the time she consumed the funds in late November. Indeed, that payment was primarily designed to compensate her for defending Alford at trial. Respondent never represented Alford at trial or otherwise disposed of the case, and she thus was not entitled to keep the full second payment of $1,500.00.[19]

In sum, Respondent should have placed Alford's payments in her trust account and transferred them to her operating account only after "conferring a benefit on or performing a legal service".[20] for Alford, with such transfers bearing a reasonable relationship to the work rendered. We find by clear and convincing evidence that Respondent did not safeguard Alford's unearned fees but rather treated them as her own and commingled them with her own property in violation of Colo. RPC 1.5(f) and 1.15(a) (2008).

We now turn to the People's claim that Respondent charged an unreasonable fee in violation of Colo. RPC 1.5(a). The People do not premise this charge on an argument that $3,000.00 was an excessive fee for Respondent's representation of Alford, nor do we adjudge the charge excessive. Instead, the People assert that Respondent violated this rule by collecting $3,000.00 from Alford even though she did not resolve the criminal case. In our view, Colo. RPC 1.5(a) is principally directed at a different type of misconduct: charging a fee that is too high for the nature of the work performed. Although there is some support for the proposition that lawyers might violate Colo. RPC 1.5(a) by retaining payment for work they do not ultimately complete,[21] the Hearing Board does not find a violation here. As explained further below, we do find that Respondent violated Colo. RPC 1.16(d) by failing to return unearned fees, and we deem it unfair and unnecessary to find that the same misconduct also violates Colo. RPC 1.5(a).[22]

Next, the People allege that Respondent violated Colo. RPC 1.4(a)(3), which requires a lawyer to keep a client reasonably informed about the status of a matter. According to the People, Respondent failed to communicate with Alford about his case and failed to notify him when she withdrew. The Hearing Board finds that Respondent reasonably communicated with Alford about his case. But we credit Alford's testimony that Respondent did not notify him when she withdrew and that he was surprised to learn of this development from Brown. For this reason, we conclude that she violated Colo. RPC 1.4(a)(3).

The People also allege that Respondent violated Colo. RPC 1.16(d), which requires a lawyer to protect a client's interests upon termination of the representation, such as by returning unearned fees and giving reasonable notice to the client. The People assert that Respondent did not inform Alford of her intent to withdraw and did not refund unearned fees. The Hearing Board recognizes that Respondent did help to protect Alford's interests by recommending that he hire Trimble, who proved to be an effective advocate. Nevertheless, Respondent did not tell Alford that she was withdrawing and she failed to repay unearned fees, so we thus conclude that she violated Colo. RPC 1.16(d).

Finally, the People assert that Respondent acted dishonestly by knowingly converting Alford's funds. Colo. RPC 8.4(c) prohibits lawyers from knowingly or recklessly treating unearned funds as their own.[23]

---

19. The evidence does not make clear the precise portion she earned, if any.

20. *Id.* at 410.

21. *See, e.g., In re Bilderback*, 971 P.2d 1061, 1063 (Colo.1999) (finding that an attorney violated Colo. RPC 1.5(a) by collecting a fee from which the client did not benefit); *People v. Ebbert*, 925 P.2d 274, 278 (Colo.1996) (holding that an attorney collected an unreasonable fee "because he did not provide either the legal services agreed to or refund the unused part").

22. This decision does not meaningfully affect the outcome in this matter. In our sanctions analysis, we are called upon to assign a sanction based upon the nature of the misconduct at issue, not the technical number of rule violations. A finding of a Colo. RPC 1.5(a) violation would not change how we weigh the aggravating factor of multiple rule violations.

23. *See, e.g., People v. Zimmermann*, 922 P.2d 325, 326 (Colo.1996) (deeming an attorney's failure to deposit unearned advance fees into his trust account a violation of the predecessor to Colo. RPC 8.4(c)).

The evidence shows that Respondent treated Alford's funds as her own without having fully earned them. Within two weeks of Alford's second payment of $1,500.00, Respondent's debit card withdrawals and account fees had lowered her balance to $133.19. She had not completed the promised scope of work for Alford by that time, yet she used the funds for her own purposes.

We do not agree with the People, however, that Respondent converted Alford's funds with a knowing state of mind. We deem credible Respondent's testimony that she believed she was handling Alford's legal fees in accordance with applicable law, and the People have not adduced clear and convincing evidence that she understood she was depriving Alford of funds belonging to him. Yet we also cannot find Respondent's conduct to be merely negligent, because lawyers are presumed to know the Rules of Professional Conduct.[24] We conclude that she should have learned and complied with the applicable rules, and by failing to do so she recklessly violated Colo. RPC 8.4(c).[25]

### Grewal Matter

Jasjit Grewal, a retired engineer who owns a ranch near Pagosa Springs, hired Respondent on December 22, 2011.[26] In 2010, he had entered into a contract to sell a log skidder, a piece of heavy machinery used in logging operations.[27] According to Grewal, he received no payments for the log skidder. The contract, which Grewal wrote on a used piece of paper, reads:

Contract for 1980 CLARK log skidder

I, Nathan Morehouse, am purchasing above machine for the sum of $22,000, with $1,000.00 down now, and, $6,000.00 or $7,000 in Nov. [unclear] Dec. 2010, with 5% interest on remaining balance till fully paid.

Any major Breakdown, price above can be lowered to mutually and honest reappraisal acceptable, to both. This is based on mutual trust and respect, honored by integrity. Nate Morehouse [signed] 8/26/10.[28]

Respondent's fee agreement with Grewal states that Respondent was retained "to provide legal services in connection with his attempt to recover property or in the alternative a money demand...."[29] The agreement provided for a $1,500.00 retainer and hourly legal fees of $100.00.[30] Grewal paid Respondent $1,000.00 on January 5, 2012, and an additional $500.00 on March 5, 2012.[31] Both checks were deposited into the firm's checking account.[32] The account's balance was $3,927.65 on January 31, 2012, and $2,700.00 on March 30, 2012.[33] As in the Alford representation, Respondent made no deposits into or withdrawals from her trust fund relating to Grewal's case.

According to Grewal, Respondent never performed any work on this matter. Respondent, by contrast, testified that she sent a demand letter to Morehouse, but it was returned by the post office. She said she could not file an action to recover the skidder because Grewal did not know the VIN number, the contract contained no firm due date for payments, Grewal lacked proof of consideration to support the contract, and More-

---

**24.** *In re Fisher,* 202 P.3d 1186, 1198 (Colo.2009) ("All Colorado attorneys are presumed to be aware of the Rules of Professional Conduct and their impact.").

**25.** *See People v. Rader,* 822 P.2d 950, 953 (Colo. 1992) (noting that the required mental state for the predecessor to Colo. RPC 8.4(c) is satisfied "when it is established that the attorney deliberately closed his eyes to facts he had a duty to see") (quotations and citations omitted); *see also Zimmermann,* 922 P.2d at 329, 329 n. 1 (finding support for a hearing board's determination that a lawyer recklessly violated Colo. RPC 8.4(c) where the lawyer had not reviewed disciplinary rules or cases and "never took any steps to clarify his fiduciary duty with respect to client funds").

**26.** Ex. 23 at 0072–73.

**27.** Ex. 23 at 0069.

**28.** Ex. 23 at 0069.

**29.** Ex. 23 at 0072.

**30.** Ex. 23 at 0072.

**31.** Ex. 23 at 0105–06.

**32.** Ex. 36 at 0736.

**33.** Ex. 36 at 0736.

house ultimately left the state with the skidder. Respondent said she hoped to negotiate a resolution with Morehouse but he would not answer his phone, allow her on his property, or otherwise engage in discussions. She also testified that she drafted a complaint for Grewal, though it was never filed.

In early 2012, Grewal visited India for about two months. Upon his return, he sought unsuccessfully to obtain a visa for his Indian fiancée. He said Respondent helped minimally by giving him contact information for the Department of State. Respondent, meanwhile, testified that when Grewal returned from India, he told her to set aside work on the log skidder matter and to focus on obtaining a visa for his fiancée. Respondent said she then called consulates, senators, a congressional representative, and an office in Mumbai.

Grewal asserts that he never heard from Respondent after paying her in March 2012.[34] In his mind, she abandoned the case. Respondent, however, believes she earned her retainer because she worked on the skidder case, the visa matter, and two other legal issues. Specifically, she testified that she made calls on Grewal's behalf about a matter concerning machinery in Routt County, and she also investigated an issue involving a land swap and a Texas ranch operator, including research on contracts, fraud, and the statute of limitations. Grewal denies that he asked her to work on these issues, saying that he told her he might hire her to pursue other legal matters only after he recovered funds for the skidder.

On the whole, the Hearing Board finds Respondent's testimony about her work for Grewal to be somewhat more credible than Grewal's. Grewal was confused and inconsistent on a number of issues, both in his testimony and in the materials he submitted to the People as part of his grievance. For instance, Grewal wrote two letters to Re-

spondent that were dated 2011, but the evidence makes clear that both letters were actually written in 2012 or 2013.[35] In addition, he told the People he "never had any property dispute with any man from Texas," [36] but on cross-examination, he conceded that he in fact did have such a dispute. He also denied that Respondent ever brought up weaknesses with the skidder contract, saying that she assured him there would be no difficulty in recovering the monies he was owed. We find it very implausible that Respondent would have failed to mention the highly apparent deficiencies in the contract. Finally, given the nature of human emotions, we have no trouble believing that Grewal, upon returning from India, would have urged Respondent to focus on reuniting him with his fiancée.[37]

The People charge that Respondent violated the same Rules of Professional Conduct in the Grewal representation as they charged in the Alford matter. In addition, they allege that Respondent violated Colo. RPC 1.3, which requires a lawyer to act with reasonable diligence and promptness.

█ We first consider Colo. RPC 1.3. This is a close issue. Despite the numerous shortcomings with the log skidder contract, Respondent probably could have initiated litigation on Grewal's behalf. However, we find that Respondent did perform some work on this case, including sending Morehouse a demand letter and attempting to meet with him, and we also find that Grewal asked her to focus on legal issues other than the skidder. We thus do not find that Respondent neglected the skidder case.

█ We do, however, find that Respondent failed to keep Grewal reasonably informed, thereby violating Colo. RPC 1.4(a)(3). He wrote several letters to her expressing confusion about why she had not pursued the log skidder case.[38] The evidence strongly suggests that she never

---

34. *See also* Ex. 23 at 0073.

35. Ex. 23 at 0085; Ex. 30 at 0100.

36. Ex. 30 at 0095.

37. Grewal also appears to deeply resent Respondent. In his communications with the People, he

labels her "devious" and an "inveterate liar," saying "her audacity exceeds her deep mendacity" and offering to undergo a polygraph test. Ex. 23 at 0065, 0083–84.

38. Ex. 30 at 0099–01.

responded to the letters. Although his confusion may in part reflect a failure to appreciate that Respondent had pursued other matters at his direction, we believe Respondent had a duty to make clear to Grewal her course of action and the status of his case. She failed in this regard.

■ Turning to the People's next claim, we find no violation of Colo. RPC 1.5(a). The sum of $1,500.00 was not unreasonable for the log skidder matter, nor was Respondent's hourly rate of $100.00 remotely excessive for the skidder or other matters Grewal asked her to work on. We find it likely that Respondent in fact completed at least fifteen hours of work for Grewal.

■ Next, we consider together the Colo. RPC 1.5(f) and 1.15(a) (2008) charges. Grewal hired Respondent on December 22, 2011, paid her $1,000.00 on January 5, 2012, and paid her an additional $500.00 on March 5, 2012. Respondent deposited the checks into the firm's checking account, not a trust account. She testified that she completed much of her work on the skidder case when Grewal was in India, apparently in early 2012. This evidence strongly suggests that Respondent had not earned Grewal's $1,000.00 payment at the time she deposited it into her checking account on January 5, 2012. We thus conclude that Respondent violated Colo. RPC 1.5(f) and 1.15(a) (2008) by failing to safeguard client funds.

■ The People's Colo. RPC 1.16(d) claim is premised upon Respondent's failure to refund Grewal's unearned fees. As noted above, we find it likely that Respondent earned the $1,500.00 retainer by performing work on several cases for Grewal. Respondent's fee agreement contained an hourly fee of $100.00, and she likely performed at least fifteen hours of work—with Grewal's authorization—on some combination of the log skidder, visa, Routt County, and land swap cases.

The People have failed to adduce clear and convincing evidence showing that Respondent did not earn the full retainer, so we do not find a violation of Colo. RPC 1.16(d).

■ Finally, we consider whether Respondent converted funds in violation of Colo. RPC 8.4(c). For the same reasons discussed in the context of Colo. RPC 1.16(d), we do not find dishonest conduct here. Respondent likely provided $1,500.00 worth of legal services to Grewal. Moreover, the mere act of depositing unearned fees into her operating account does not necessarily amount to knowing conversion.[39] Unlike in the Alford case, there is no evidence that Respondent consumed Grewal's funds. In January and March 2012, the balance of her account remained above the amount he gave to her. We thus reject the People's Colo. RPC 8.4(c) claim.

### Stevens Matter

■ Judy Stevens owns a court-reporting firm called Stevens–Koenig Reporting. In July 2012, the firm prepared three deposition transcripts at Respondent's request. The firm sent the transcripts to Respondent along with an invoice for $1,346.98.[40]

Respondent did not remit payment. Stevens sent reminder invoices in September and October 2012, but still Respondent did not pay.[41] Stevens then contacted Respondent by email and phone in December, noting that she would file a grievance if Respondent did not pay. Respondent immediately responded, saying she was "in a jam" and "trying to collect these funds."[42] The next month, Stevens again emailed Respondent.[43] She replied that she could pay some of the balance and asked whether Stevens accepted credit card payments.[44] Stevens responded in the affirmative, but Respondent never submitted any payment.

39. *See People v. Varallo*, 913 P.2d 1, 11 (Colo. 1996) ("depositing client funds into a trust account with a negative balance, if done only negligently, would be a technical rather than knowing conversion of client funds").

40. *See* Ex. 13 at 0042–44.

41. Ex. 13 at 0044.

42. Ex. 13 at 0046.

43. Ex. 13 at 0047.

44. Ex. 13 at 0046.

Respondent admitted at the hearing that she owes Stevens for her services and insisted that she is committed to paying Stevens as soon as she is financially able to do so. Stevens confirmed that Respondent has never refused to pay the invoice but rather has said she is unable to pay.

By failing to pay Stevens, Respondent violated Colo. RPC 8.4(d), which provides that it is misconduct to engage in conduct prejudicial to the administration of justice.[45]

## III. SANCTIONS

■ The American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991 & Supp. 1992) ("ABA *Standards*") and Colorado Supreme Court case law guide the imposition of sanctions for lawyer misconduct.[46] In imposing a sanction after a finding of lawyer misconduct, the Hearing Board must consider the duty violated, the lawyer's mental state, and the actual or potential injury caused by the misconduct. These three variables yield a presumptive sanction that may be adjusted in consideration of aggravating and mitigating factors.

### ABA *Standard* 3.0—Duty, Mental State, and Injury

*Duty:* Respondent violated her duties to her clients to safeguard and preserve funds and to properly communicate with them. Her failure to properly withdraw is considered a dereliction of her duty as a professional under the ABA *Standards*, while neglecting to pay for deposition transcripts is denominated a violation of her duty to the legal system.

*Mental State:* We conclude Respondent should have known—but did not in fact know—that she was violating Colo. RPC 8.4(c). Likewise, her mistaken understand-

ing about when fees are deemed earned underlay her failure to safeguard client funds in a trust account in accordance with Colo. RPC 1.5(f) and 1.15(a) (2008). We also find that Respondent acted with a reckless state of mind when she inadequately communicated with her clients and failed to properly withdraw. Finally, we find that Respondent knowingly failed to repay Stevens.

*Injury:* In the Alford case, Respondent caused her client actual injury by refusing to return any portion of his second $1,500.00 payment. She also caused Alford potential injury by failing to safeguard his funds upon receipt. By neglecting to properly notify him that she was withdrawing as counsel, she deprived him of critical information about his criminal case and thus by definition harmed him. In the Grewal matter, her failure to ensure that her client understood the status of his case caused him some stress, while her failure to safeguard funds posed a risk of harm. Finally, Respondent caused Stevens actual injury by failing to pay her for services performed.

### ABA *Standards* 4.0–7.0—Presumptive Sanction

ABA *Standard* 4.12 identifies suspension as the presumptive sanction when a lawyer should know that she is dealing improperly with client property and causes the client injury or potential injury. Suspension is likewise the presumptive sanction under ABA *Standard* 7.2 for Respondent's failure to properly withdraw from representation.[47] We thus begin our analysis with the presumptive sanction of suspension.

### ABA *Standard* 9.0—Aggravating and Mitigating Factors

Aggravating factors are considerations that may justify an increase in the presump-

45. *See, e.g., People v. Goens,* 803 P.2d 480, 482 (Colo.1990) (holding that a lawyer's failure to pay for a court transcript was conduct prejudicial to the administration of justice).

46. *See In re Roose,* 69 P.3d 43, 46–47 (Colo. 2003).

47. The ABA *Standards* identify *Standard* 6.0 as the frame of reference for violations of Colo. RPC 8.4(d), yet *Standards* 6.1, 6.2, and 6.3 do not

correspond to the misconduct at issue here. We also find that ABA *Standard* 4.4—the standard presumptively applicable to Respondent's inadequate communication—does not square with Respondent's misconduct. Since the presumptive sanctions for these instances of misconduct surely would not be disbarment, and the starting point in our analysis would thus remain the same, we find it unnecessary to identify a specific presumptive sanction for these rule violations.

tive discipline to be imposed, while mitigating factors may justify a reduction in the severity of the sanction.[48] The Hearing Board considers evidence of the following aggravating and mitigating circumstances raised by the parties. As explained below, we apply five aggravating factors—two of which carry comparatively little weight—and four mitigating factors—two of which merit limited weight.

*Dishonest or Selfish Motive—9.22(b):* The People ask us to apply this factor in aggravation, arguing that Respondent knew she was converting client funds. We decline to do so. Even though Respondent violated Colo. RPC 8.4(c) in the Alford case, we do not believe that she meant to act dishonestly. Instead, we find she was acting under the belief that she was complying with applicable law.

*Pattern of Misconduct—9.22(c):* In this case, Respondent engaged in a pattern of inadequate communication, mishandling of client funds, and failure to repay monies owed to others. This factor counts in aggravation. We do not find Respondent's pattern of conduct to be particularly pronounced, however, so we assign relatively little weight to this factor.

*Multiple Offenses—9.22(d):* We consider in aggravation the fact that Respondent engaged in multiple types of misconduct.

*Bad Faith Obstruction of Disciplinary Proceeding—9.22(e):* The record indicates that Respondent has not been particularly cooperative with the People. As but two examples, she did not timely make initial disclosures and she did not endeavor in good faith to timely produce the Alford file to the People. She also disregarded the PDJ's order that she submit a hearing brief and relevant legal authority in advance of the hearing. We thus apply this aggravating factor.

*Refusal to Acknowledge Wrongful Nature of Conduct—9.22(g):* Respondent has delayed in assuming ownership of her misconduct. She persisted in the position that she earned flat fees upon receipt, despite ample opportunity to recognize the applicable legal principles. In addition, she only acknowl-

edged her debt to Stevens when Stevens threatened to report her misconduct. Yet Respondent stated that she realizes she needs assistance in her practice and that she has tried to seek such assistance. The Hearing Board finds that she was sincere in ultimately accepting responsibility for her misconduct, and we thus apply relatively little weight in aggravation to this factor.

*Vulnerability of Victims—9.22(h):* We reject the People's recommendation that we apply this aggravating factor, as we do not find any of the complaining witnesses to be particularly vulnerable. Although Grewal is retired, no evidence suggests that he is indigent, disabled, or otherwise particularly susceptible to exploitation.

*Indifference to Making Restitution—9.22(j):* Respondent has acknowledged her debt to Stevens, and her financial circumstances have impaired her ability to repay Stevens. But Respondent communicated with Stevens only under the threat of a grievance, and Respondent's debt remains fully unpaid after three and a half years, even though she told Stevens in early 2013 that she could afford to make a partial payment. We thus apply this factor in aggravation.

*Absence of Prior Disciplinary Record—9.32(a):* Respondent has no disciplinary record, which is a mitigating factor. Yet she had been practicing just a few years at the time of her misconduct, so we accord limited weight to this factor.

*Absence of Dishonest or Selfish Motive—9.32(b):* We choose not to apply this factor. Although we do not find that Respondent intended to act dishonestly or selfishly, we also believe she recklessly failed to ensure she understood and followed the rules governing client funds. We cannot reward this laxity by giving her credit in mitigation.

*Personal or Emotional Problems—9.32(c):* Respondent testified that she was going through a divorce at the time of her misconduct and that she faced other significant personal stresses, including sexual harassment that led her to file an EEOC complaint,

---

48. *See* ABA *Standards* 9.21 & 9.31.

as well as the challenges of caring for two disabled children. We consider these circumstances in mitigation.

*Timely Good Faith Effort to Make Restitution—9.32(d):* Although we recognize that Respondent has been in difficult financial straits, there is no evidence that she has made any concrete effort to repay Stevens or Alford, such as by making small payments as a demonstration of good faith. We therefore do not apply this factor.

*Full and Free Disclosure to Disciplinary Board or Cooperative Attitude Toward Proceedings—9.32(e):* Respondent argues that this factor should apply, but we disagree. Her participation and cooperation in this case do not merit commendation.

*Inexperience in the Practice of Law— 9.32(f):* Respondent had only been licensed for a few years at the time of her misconduct. We consider this fact in mitigation as to the Alford and Grewal representations, though not as to her failure to pay Stevens.

*Character or Reputation—9.32(g):* Respondent called no character witnesses, nor did she introduce any other evidence of good character or reputation. She did testify that she has received multiple awards for pro bono service, and the evidence as a whole suggests that she is committed to helping underserved clients. For instance, she believed Grewal had a limited income, and she thus charged him a very low hourly fee of $100.00. The evidence concerning Respondent's character is relatively scant, however, so we assign relatively little weight in mitigation to this factor.

*Remorse—9.32(l):* Although Respondent testified that she was remorseful for her misconduct, this testimony was not entirely persuasive, nor was it supported by any corroborating evidence, such as letters to her

former clients or to Stevens. We thus do not apply this factor in mitigation.

### Analysis Under ABA *Standards* and Case Law

The Hearing Board recognizes the Colorado Supreme Court's directive to exercise discretion in imposing a sanction and to carefully apply aggravating and mitigating factors,[49] mindful that "individual circumstances make extremely problematic any meaningful comparison of discipline ultimately imposed in different cases."[50] Though prior cases are helpful by way of analogy, the Hearing Board must decide the appropriate sanction for a lawyer's misconduct on a case-by-case basis.[51]

The People ask the Hearing Board to impose, at minimum, a suspension with the requirement of reinstatement. The People stress that they adjudge Respondent to be "unreliable, uncommunicative, uncooperative and unprofessional," and thus "unsuitable for the variety of regulation that involves supervision."[52] Respondent, meanwhile, said that she hopes to return to practicing law but would like a mentor's assistance in navigating administrative challenges.

Unfortunately, the Hearing Board has been unable to identify any recent Colorado Supreme Court case law with facts analogous to those presented here. We thus turn to older case law, heeding the Colorado Supreme Court's warning that cases pre-dating the 1999 adoption of the current disciplinary rules may carry limited weight.[53]

In *People v. McGrath,* a lawyer obtained a judgment of approximately $1,500.00 for a client and then received checks to satisfy the judgment.[54] The lawyer deposited some of those funds into his business account and used them for his own purposes.[55] He also neglected to return the client's phone calls

---

**49.** *See In re Attorney F.,* 285 P.3d 322, 327 (Colo. 2012); *In re Fischer,* 89 P.3d 817, 822 (Colo. 2004) (finding that a hearing board had overemphasized the presumptive sanction and undervalued the importance of mitigating factors in determining the needs of the public).

**50.** *In re Attorney F.,* 285 P.3d at 327 (quoting *In re Rosen,* 198 P.3d 116, 121 (Colo.2008)).

**51.** *In re Olsen,* 326 P.3d 1004, 1009 (Colo.2014).

**52.** Complainant's Hr'g Br. at 2.

**53.** *In re Attorney F.,* 285 P.3d at 327.

**54.** 780 P.2d 492, 492 (Colo.1989).

**55.** *Id.* at 493.

and to comply with the client's request for an accounting.[56] Then, during the disciplinary investigation, the lawyer made a false statement about how he had handled client funds.[57] The Colorado Supreme Court held that, although there was some doubt as to whether the lawyer knowingly converted his client's funds, he should have known, at minimum, that he was improperly handling funds.[58] The Colorado Supreme Court therefore approved the parties' stipulation to suspension for one year and one day.[59] Here, similarly, Respondent certainly should have known the law regarding her duty to hold Alford's payments in trust until her fees were earned, and she clearly failed to abide by the law.

Likewise, in *People v. Wechsler*, a lawyer was suspended for a year and a day after he neglected to place client funds in a trust account, misrepresented the location of the funds, and failed to provide an accounting to a client for nearly two years.[60] *Wechsler* and *McGrath* are consistent with several other Colorado Supreme Court cases.[61]

[17] Taking into account the age of the case law discussed above and the aggravating factors here, the Hearing Board concludes that Respondent's misconduct warrants a suspension for eighteen months. This decision is based in large measure on our finding that Respondent failed to educate herself about the Rules of Professional Conduct and to cooperate in the disciplinary process. Although she worked in rural areas where she felt that access to professional support was limited, we find that she adopted an indifferent attitude toward her duties. This is illustrated, in part, by her failure to meaningfully

research whether Colorado law treats flat fees as earned upon receipt. The appropriate sanction is suspension for eighteen months, which will require Respondent to petition for reinstatement and prove by clear and convincing evidence that she is prepared to conscientiously undertake the varied responsibilities attendant to the practice of law.

As a final note, we believe Respondent would greatly benefit from guidance and mentoring should she return to the practice of law. If Respondent petitions for reinstatement, we thus respectfully recommend that a future hearing board condition any reinstatement upon her agreement to undergo a period of practice monitoring and trust account monitoring supervised by the People.

## IV. CONCLUSION

Respondent recklessly converted client property, neglected her duties to safeguard funds and properly communicate with clients, and failed to pay a court reporter's invoice. This misconduct warrants a suspension for eighteen months—a suspension that will account for the seriousness of her misconduct while affording her a meaningful opportunity to rehabilitate herself as a lawyer.

## V. ORDER

The Hearing Board therefore **ORDERS**:

1. **LYNDA ELIZABETH CARTER**, attorney registration number 41106, is **SUSPENDED FOR EIGHTEEN MONTHS.** The **SUSPENSION SHALL** take effect only upon issuance of an "Order and Notice of Suspension." [62]

---

56. *Id.*

57. *Id.*

58. *Id.*

59. *Id.*

60. 854 P.2d 217, 223 (Colo.1993).

61. *See People v. Harding*, 967 P.2d 153, 155 (Colo.1998) (suspending for a year and a day a lawyer who used client funds for his own purposes, knowingly disobeyed a court order, and engaged in conduct prejudicial to the administration of justice, among other misconduct); *Zimmermann*, 922 P.2d at 328 (suspending for a year

and a day a lawyer who for more than three years consistently mismanaged his trust account and recklessly misappropriated client funds); *People v. Galindo*, 884 P.2d 1109, 1110–12 (Colo. 1994) (suspending for a year and a day a lawyer who neglected a matter, intentionally prejudiced or damaged the client, mishandled client property, and failed to timely pay funds to a client, among other misconduct, where mitigating factors greatly outweighed aggravators). We note that these decisions pre-date *Sather*.

62. In general, an order and notice of sanction will issue thirty-five days after a decision is entered pursuant to C.R.C.P. 251.19(b) or (c). In some instances, the order and notice may issue

2. To the extent applicable, Respondent **SHALL** promptly comply with C.R.C.P. 251.28(a)–(c), concerning winding up of affairs, notice to parties in pending matters, and notice to parties in litigation.

3. Respondent **SHALL** file with the PDJ, within fourteen days of issuance of the "Order and Notice of Suspension," an affidavit complying with C.R.C.P. 251.28(d).

4. The parties **MUST** file any posthearing motion or application for stay pending appeal **on or before January 6, 2016.** Any response thereto **MUST** be filed within seven days.

5. Respondent **SHALL** pay the costs of this proceeding. The People **SHALL** file a statement of costs **on or before December 30, 2015.** Any response thereto **MUST** be filed within seven days.

6. Respondent **SHALL** make full restitution to Judy Stevens, including any applicable interest or late fees under established policies of Stevens's firm, as a condition of petitioning for reinstatement. Respondent **SHALL** pay this restitution **no later than June 16, 2016.**

7. Respondent **SHALL** make full restitution to Alford in the amount of $1,500.00, plus statutory interest from January 18, 2013, until paid, as a condition of petitioning for reinstatement. Respondent **SHALL** pay this restitution **no later than June 16, 2016.**

8. Respondent **SHALL** attend the ethics school and trust account school continuing legal education courses sponsored by the People as a condition of petitioning for reinstatement.

later than thirty-five days by operation of C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.